Liston MONSANTO, Appellant,

v.

Leroy A. QUINN, Commissioner, Department of Finance.

No. 81–1434.

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1981.

Decided March 11, 1982.

Brenda J. Hollar (argued), St. Thomas, V. I., for appellant.

Robert L. King (argued), Jessie Bethel, Asst. Atty. Gen., Dept. of Law, St. Thomas, V. I., for appellee.

Before HUNTER, VAN DUSEN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

Before us is an appeal by Liston Monsanto, an employee of the Tax Division of the Virgin Islands Department of Finance, from an order of the district court of the Virgin Islands affirming the decision of the Virgin Islands Government Employees Service Commission [1] (GESC) that Monsanto be suspended from his job for ninety days without pay. Monsanto seeks a reversal of the ninety day suspension order, and an award of back wages for ninety days, together with costs for this action, including attorney's fees.

At the time of his suspension, Monsanto, who had been employed in the Department of Finance for approximately twenty-one years, held the position of Internal Revenue Officer IV within the delinquent accounts and returns branch of the Tax Division.[2] His primary duties included the investigation of delinquent taxpayers and the collection of taxes. During the period between October 1975 and the time of his suspension in August 1979 Monsanto, dissatisfied with the operation of the Tax Division, wrote a series of letters to Commissioner of Finance Leroy Quinn and Tax Division Director Anthony Olive in which he complained that the Division was poorly managed and that the morale of its employees was low; criticized the structure of the Division; and sought the elimination of certain employment positions. In at least one letter, Monsanto alleged that several of the employees of the Tax Division had attempted to defraud the government by filing fraudulent tax returns. Monsanto claimed that the problems in the Division were impairing the effectiveness of the Division's tax-collecting operations. Copies of most of the letters were also sent to the Governor and the Lieutenant Governor of the Virgin Islands.

On August 15, 1979 Fred Clarke, a broadcaster on a local radio show, summarized and discussed the contents of letters, allegedly those written to his supervisors by Monsanto, criticizing the Tax Division. In response to this broadcast, Commissioner Quinn on August 17, 1979 released a statement to the press in which he attacked the broadcast as "irresponsible reporting" and defended his integrity and that of the employees of the division. Clarke responded in a broadcast on August 20, 1979.

On August 24, 1979, Commissioner Quinn initiated dismissal proceedings against Monsanto by serving upon him a letter containing the following charges:

(1) Beginning in October 1975, you have been attempting to tarnish the image of the Tax Division, Department of Finance and the integrity of its employees through a stream of malicious letters. During the week of August 13th, and August 20th, 1979, you released letters to the media which contain such serious alle-

---

**1.** The GESC, a statutory commission within the office of the Governor of the Virgin Islands, has both investigatory and advisory jurisdiction and the power, *inter alia*, to conduct a hearing and render a decision when a government employee appeals from a proposed suspension or dismissal from employment. *See* 3 V.I.C. §§ 451, 472, 530(b). *See generally Bryan v. Christian*, 550 F.2d 890, 14 V.I. 3 (3d Cir. 1977).

**2.** At the relevant time, the Tax Division was one of several divisions within the Department of Finance, an executive department within the Government of the Virgin Islands. *See* 3 V.I.C. §§ 171, 174. The Tax Division was composed of four sections, including the delinquent accounts and returns branch. The Department of Finance was headed by the Commissioner of Finance, Leroy Quinn, the appellee in this action. *See id.* at § 172. The director of the Tax Division was Anthony Olive. The chief of the delinquent accounts and returns branch and appellant's immediate supervisor was Robert Woods.

gations as fraud and the preparation of fraudulent tax returns in an attempt to disrupt the operation of the Department of Finance, its Tax Division, Revenue Officers and employees.

(2) Beginning with your letter of June 9, 1976, and continuing [with thirteen letters through August 22, 1979] you have been engaged in character assassinations of your co-workers and supervisor who have refused to join you in your disruptive actions.

(3) On Monday, March 19, 1979, in the presence of your immediate supervisor, Mr. Robert Woods and the Director, Tax Division, Mr. Anthony Olive, you were ordered to discontinue using Government equipment, supplies and the letterhead of the Tax Division in writing these malicious letters. You were also ordered to discontinue hand-delivery of these letters during regular working hours at this same meeting, but this practice continues.

(4) You have failed to devote 8 hours each day to your job for which you are being paid.

(5) On December 20, 1978 you violated the disclosure rules of the Internal Revenue Code, Section 6013 [sic], of which you had full knowledge.

Quinn's letter notified Monsanto that his continued presence at his duty station "would be detrimental to the Department and the public interest" and he was therefore temporarily relieved with pay until action by the GESC. A copy was sent to the Governor with Quinn's recommendation that Monsanto be dismissed.

Monsanto appealed his proposed dismissal to the GESC, pursuant to 3 V.I.C. § 530(a).[3] The GESC conducted hearings, and made the following findings of fact: ·

(1) commencing in October 1975 and continuing to the present, Monsanto submitted "numerous letters" to government personnel, including the Commissioner of Finance and the Governor and Lieutenant Governor, "which had a disruptive effect on the operation of the Department of Finance";

(2) on August 13, 1979 and August 20, 1979 Monsanto "released letters to the media which further disrupted the workings of the Tax Division";

(3) Monsanto "wrote numerous letters and memoranda on Government stationery and utilized secretarial services in the Department of Finance, during regular working hours" and continued to do so "after being specifically instructed to cease";

(4) Monsanto delivered the letters to the office of the Commissioner during regular working hours; and

(5) Monsanto did not violate the disclosure rules of I.R.C. § 6103.

In its accompanying memorandum, the GESC rejected Monsanto's claim that action against him would violate his First Amendment rights and held that Monsanto's activities "constitute[d] unprotected speech."

The GESC ordered that Monsanto be suspended for ninety days without pay. It rejected Quinn's request that Monsanto be dismissed, stating "in light of Mr. Monsanto's exemplary performance ratings, such an action would not serve the best interest of the Government of the Virgin Islands; a 90 day suspension without pay should suffice."[4]

Monsanto subsequently petitioned the district court for a writ of review of the GESC decision pursuant to 5 V.I.C. § 1421 et seq.[5]

---

**3.** Under section 530(a), the employee has ten days following the receipt of the statement of charges against him in which to appeal the proposed action to the GESC. 3 V.I.C. § 530(a). Section 530(b) provides that the GESC shall meet within 30 days after the filing of the appeal to conduct a hearing at which the department head and the employee are entitled to call witnesses and be represented by counsel. *Id.* § 530(b). The Commission must render its decision within 14 days after termination of the hearing. *Id.*

**4.** The GESC has the statutory authority to sustain or reverse the decision of the department head, or to reduce the recommended penalty from dismissal or demotion to suspension for a period not to exceed 90 days "if the Commission finds such action to be warranted and in the public interest." 3 V.I.C. § 530(c).

**5.** Despite the language in 3 V.I.C. § 530(b) that "the [Government Employees Service] Commission's decision shall be final," it has been established that the Commission's actions are

The district court granted review and, after reviewing the record of the GESC proceedings and the parties' briefs, entered an order affirming the decision of the GESC on the ground that its decision was supported by "substantial evidence" and was "otherwise correct as a matter of law."

## II.

On appeal Monsanto raises three contentions: (1) that the GESC erred as a matter of law in concluding that his letter writing did not constitute protected speech within the meaning of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); (2) that the factual findings of the GESC are not supported by substantial evidence; and (3) that the GESC impermissibly deviated in its fact-finding from the original charges brought by Commissioner Quinn.[6]

In *Trotman v. Board of Trustees of Lincoln University*, 635 F.2d 216, 224 (3d Cir. 1980), *cert. denied*, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981), we reviewed the three-step process required in examination of a public employee's claim of retaliation based on engagement in protected activity: (1) the plaintiff must show that s/he engaged in protected activity, *see Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); (2) if successful in demonstrating that the activity was protected, the claimant must then show that the activity was a substantial or motivating factor in a decision or action taken against the claimant, *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); and (3) the defendant has the opportunity to defeat plaintiff's claim by demonstrating that the same action would have been taken even in the absence of the protected conduct, *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58

L.Ed.2d 619 (1979); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576.

In *Pickering v. Board of Education, supra*, the Supreme Court held that determination whether a public employee's speech was constitutionally protected requires balancing the employee's free speech interest against the state's interest in providing efficient public service: "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568, 88 S.Ct. at 1734. The speech at issue in *Pickering* was a letter written by a high school teacher to a local newspaper criticizing, *inter alia*, the School Board's allocation of school funds between educational and athletic programs, and charging that the superintendent of schools attempted to prevent teachers from opposing or criticizing a proposed bond issue. *Id.* at 566, 88 S.Ct. at 1733. The School Board determined, after a hearing, that many of the statements in Pickering's letter were false, and dismissed him on the ground that the publication of the letter was detrimental to the operation and administration of the school system. *Id.* at 564, 567, 88 S.Ct. at 1732, 1734. In holding that Pickering's speech constituted protected activity, the Court stated that "in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574, 88 S.Ct. at 1737 (footnote omitted). In applying the balancing test, the Court considered both the nature of the speech and the impact of the speech on the employment relationship and the efficiency of the public service.

---

reviewable pursuant to 5 V.I.C. § 1421 *et seq. See Bryan v. Christian*, 550 F.2d at 891 n.1, 14 V.I. at 5 n.1; *Turnbull v. Holder*, 11 V.I. 93, 98 (D.V.I.1974); *Donastorg v. Government Employees' Service Commission*, 285 F.Supp. 111, 6 V.I. 368 (D.V.I.1968).

**6.** We reject appellant's contention that the GESC impermissibly deviated in its fact-finding from the original charges brought by Commissioner Quinn. We agree with appellee that the findings of the GESC are substantially parallel to the original charges of the Commissioner

Among the factors considered relevant to the nature of the speech were whether the speech was knowingly or recklessly false, and whether the speech related to an important matter of public interest. As the Court noted,

> [T]he question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Id.* at 571–72, 88 S.Ct. at 1736.

In considering the other side of the balance, whether the impact of the speech was unacceptably disruptive, the Court looked to the following factors: (1) whether the speech interfered with the maintenance of "either discipline by immediate superiors or harmony among co-workers," *id.* at 570, 88 S.Ct. at 1735; (2) whether the speech was critical of superiors with whom the speaker maintained "the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning," *id.*; (3) whether the speech impeded the employee's proper performance of his daily duties, *id.* at 572, 88 S.Ct. at 1736; and (4) whether the speech interfered with the regular operation of the office generally, *id.* at 573, 88 S.Ct. at 1737.

The Court concluded that Pickering's statements had not adversely affected his working relationship with those whom he criticized. It also emphasized that it was not shown, nor could it be presumed, that

and not based on theories significantly differing from those contained in the dismissal letter.

**7.** To the extent that *Roseman* suggests that because the conversations were purely private,

the statements at issue "in any way either impeded the teacher's proper performance of his daily duties in the classroom or ... interfered with the regular operation of the schools generally." *Id.* at 572–73, 88 S.Ct. at 1736–37 (footnote omitted). Therefore, it concluded that Pickering's dismissal for writing the letter could not be upheld.

In *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court extended the *Pickering* doctrine to speech by public employees that was made privately rather than in public. In *Givhan*, the Court held that a teacher could not be dismissed for criticizing the school district's practices and policies in a series of private encounters between the teacher and the school principal. It stated:

> The First Amendment forbids abridgment of the "freedom of speech." Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.

*Id.* at 415 16, 99 S.Ct. at 696 97.

This court has had occasion to apply the *Pickering* balancing doctrine in cases where public employees contended that unfavorable personnel actions were taken against them because of their engagement in protected speech. In *Roseman v. Indiana University*, 520 F.2d 1364 (3d Cir. 1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976), a University faculty member claimed that her employment contract was not renewed because of charges she made against the acting chairman of her department to the college dean and later at a meeting of the department. We concluded that Roseman's statements were not protected by the First Amendment because they "were essentially private communications" which did not rise to the level of public importance present in *Pickering*, *id.* at 1368 [7], and because the element of

they were not entitled to First Amendment protection, it has been overruled by *Givhan*. *See Trotman v. Board of Trustees of Lincoln University*, 635 F.2d 216, 230 n.10 (3d Cir. 1980),

disruptive impact, absent in *Pickering*, was present. As to the latter we stated,

> Pickering's attacks were on a remote superintendent and school board; in contrast, Roseman's called into question the integrity of the person immediately in charge of running a department which, it is fair to assume, was more intimate than a school district. The district court found that "plaintiff's attacks upon Faust's integrity in a faculty meeting would undoubtedly have the effect of interfering with harmonious relationships with plaintiff's superiors and co-workers." [*Roseman v. Hassler*] 382 F.Supp. [1328] at 1339. *Id.* We specifically pointed out, however, that if Roseman's communication had concerned issues of public interest "or if she had convinced local news media that her grievance against Faust was newsworthy, entirely different considerations would come into play." *Id.* at 1368 n.11.

We relied on *Roseman* in *Sprague v. Fitzpatrick*, 546 F.2d 560 (3d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977), where we again held that no First Amendment rights were violated when the First Assistant District Attorney of Philadelphia County was discharged for having impugned the integrity of the District Attorney in an interview published in a local newspaper. We stated that "[t]he crucial variant in [the *Pickering*] balance appears to have been the hierarchical proximity of the criticizing employee to the person or body criticized," *id.* at 564, and found that the case presented "an even more egregious example [than *Roseman*] of disruptive impact," *id.* at 565. We emphasized the close working relationship between the two men and the district court's finding that the statements had "totally precluded any future working relationship"

between them. *Id.* The "irreparable breach of confidence between the two men" was in our view evidenced by the District Attorney's immediate dismissal of his assistant. *Id.* Although the speech concerned a matter of public interest (the circumstances surrounding the decision to recommend probation for a defendant), we held that this factor did not tilt the balance in favor of First Amendment protection because the "employment relationship between employee-speaker and employer-target [was] so completely undermined." *Id.*

Most recently, in *Trotman v. Board of Trustees of Lincoln University*, 635 F.2d at 230, we held that the activity of the faculty members in question, which was essentially criticism of the President of a state-related University, his policies and methods, was " 'core' speech squarely encompassed within the First Amendment." *Id.* at 225. In considering whether administrative sanctions could be justified, we looked to whether there had been material and substantial disruption. We stated that in an academic environment, a restraint on "protected activity can be sustained only upon a showing that such activity would 'materially and substantially interfere with the requirement of appropriate discipline in the operation of the school.' " [8] *Id.* at 230. *Accord, Hastings v. Bonner*, 578 F.2d 136, 143 (5th Cir. 1978). Other courts have applied the material and substantial disruption standard to First Amendment activities of public employees outside the context of the academic environment. *See, e.g., Porter v. Califano*, 592 F.2d 770, 773–74 (5th Cir. 1979); *Smith v. United States*, 502 F.2d 512, 517 (5th Cir. 1974). *But see Parker v. Levy*, 417 U.S. 733, 758–59, 94 S.Ct. 2547, 2562–63, 41 L.Ed.2d 439 (1974) (fundamental necessity for obedience in the military community requires a different, less expansive applica-

---

cert. denied, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981).

8. The trial court in *Trotman* departed from this standard when he stated that, "a public employee's speech ... is not protected by the First Amendment if it has a potentially disruptive impact on the public employer." 635 F.2d at 230. However, since the district court had

found that the tactics employed by the plaintiffs "unquestionably had a disrupting effect on the University's primary mission—education and the advancement of the Arts and Sciences," *id.*, we concluded that such a finding "satisfies even the more stringent standard of actual disruption" advocated by plaintiffs. *Id.*

tion of First Amendment protections to military personnel).

■ We turn to an examination of Monsanto's activity in light of these principles. The GESC opinion concluding that Monsanto's speech was unprotected fails to reflect the balancing required by *Pickering*.[9] The GESC discussed neither the nature of the speech at issue nor whether Monsanto's letters concerned matters of public interest. Instead, it focused primarily on the government's interest in promoting the efficiency of the public services it performs and found an "unreasonable" disruptive effect on the functioning of the Tax Division. In limiting itself to only one of the interests to be balanced, the GESC misapplied the *Pickering* instructions. As the Fifth Circuit recently emphasized:

> The First Amendment balancing test [of *Pickering*] can hardly be *controlled* by a finding that disruption did occur. An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the of-

fice. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office. . . . The point is simply that the balancing test articulated in *Pickering* is truly a balancing test, with office disruption or breached confidences being only weights on the scales.

*Porter v. Califano*, 592 F.2d 770, 773–74 (5th Cir. 1979) (emphasis in original). *See also Sprague v. Fitzpatrick*, 546 F.2d at 566 (Seitz, C. J., concurring).

We begin our independent review of the evidence [10] in this case by considering first the nature of Monsanto's activity at issue here. The record contains seventeen letters written by Monsanto during the period from October 31, 1975 to August 22, 1979.[11] These letters cover a wide range of topics, but their general theme is that of dissatisfaction with the operation and management of the Tax Division, and specifically working conditions and employee morale in the

---

9. The relevant discussion in the GESC opinion was as follows:

> This Commission is mindful of an employee's right to speech as guaranteed by the First Amendment to the Federal Constitution and Section 3 of the Revised Organic Act of 1954 [the Virgin Islands Bill of Rights, 48 U.S.C. § 1561], but believes that the protection afforded is not without limitation. When speech is such that it impairs or impedes the ability of a department head or his supervisory staff in the performance of their duties and is so voluminous as to constitute pestiferous speech, which unreasonably interferes with the functioning of an entire department or division as in the present case, such speech constitutes unprotected speech.
>
> A Commissioner or Department Head must have the cooperation of his employees and staff in order to efficiently direct the functions and operations of his department. This does not mean, however, that a Commissioner or Department Head should be free of criticism of his official actions at the hands of an employee, or that the employee may not cite problems within a given division, but only that the Department Head should not be bombarded with voluminous letters and memoranda from an employee. Mr. Monsanto has crossed the line of both logic and reason.

App. at A–20.

10. "When confronted with firings that implicate a public employee's First Amendment rights, the courts are required to conduct an individualized and searching review of the factors asserted by the employer to justify the discharge. The purpose of such a review is to assure that those factors have been applied with the deference to be accorded First Amendment rights." *Tygrett v. Barry*, 627 F.2d 1279, 1282–83 (D.C.Cir.1980). *See Grausam v. Murphey*, 448 F.2d 197, 201 (3d Cir. 1971), *cert. dismissed*, 405 U.S. 981, 92 S.Ct. 1207, 31 L.Ed.2d 257 (1972) (where violation of First Amendment rights has been alleged "a comprehensive review of the entire record is important to assure that no intrusion upon them has occurred" but, under Rule 52(a), findings of fact by the district judge are entitled to substantial weight and must be upheld unless they are found to be clearly erroneous).

11. Of the seventeen, six of the letters were written to Commissioner Quinn and seven were written to Tax Division Director Olive. The remaining letters were written to Leslie Millin, Director of Personnel, Virgin Islands Division of Personnel. Copies of most of the letters were sent to the governor and lieutenant governor of the Virgin Islands. The record also contains two letters, one to Quinn and one to a co-worker, written by Monsanto and a group of his co-workers.

delinquent accounts and returns branch. In part, they also refer to an internal dispute as to Monsanto's position in the Tax Division,[12] but the principal thrust of the letters is directed to Monsanto's suggestion that problems in the Tax Division were impairing the tax collecting functions of the division and thereby contributing to fiscal problems in the Virgin Islands. There is also a reference, amplified in Monsanto's testimony, to his concern that the Virgin Islands might lose some of its tax collecting function to the United States. Tr. at 232. It is therefore apparent that they concerned matters of public import. This conclusion is supported by the fact that the issues raised in the letters were deemed important enough to be the subject of at least two radio broadcasts.

For this reason the speech at issue here is distinguishable from the communications held unprotected in the *Roseman* case, which concerned only an internal squabble as to selection of a department chairman. As we stated in *Roseman*, where, as here, the communication concerns an issue of public interest, as evidenced by the local news media's assessment that the communication is newsworthy, "entirely different considerations ... come into play." *Roseman v. Indiana University*, 520 F.2d at 1368 n.11. Furthermore, a holding that a public employee's comments about the operation of a department with which s/he is intimately familiar are not protected speech would inhibit and discourage divulgence of information which elected officials, the press and the public need to uncover and eliminate waste and inefficiency. It is significant that the GESC made no finding that the communications in Monsanto's letters were intentionally false or malicious. *See Pickering v. Board of Education*, 391 U.S. at 574, 88 S.Ct. at 1737.

Having concluded that Monsanto's letters concerned matters of important public interest, we must next examine the impact of his speech on the operations of the Tax Division. The GESC found that the writing and release of the letters to the news media by Monsanto had a disruptive effect on the operations of the Tax Division. Our independent review of the record leads us to conclude that there is no evidence of any substantial disruption and that the small amount of disruption that may have resulted from the letters themselves or their release to the media is insufficient to tilt the balance against First Amendment protection.

As in *Pickering*, it was not shown that Monsanto's letter writing activities actually interfered with the proper performance of his daily duties as an internal revenue officer. To the contrary, the record discloses that Monsanto received satisfactory performance evaluations in his yearly employee performance reports during the four-year period from June 1974 to June 1978. The evaluations, which were made by Monsanto's immediate supervisor, Robert Woods, and reviewed and signed by Commissioner Quinn and Tax Division Director Olive, contain no reference to Monsanto's letter writing activities and any resulting disruption.[13] The report for the period from June 1976 to June 1977 states that "[s]pecial mention is made to the exemplary record of time and attendance and the successful conclusion of complex tax cases." App. at A–44. Olive testified that he believed Monsanto would be a "good candidate" to be chief of the delinquent accounts and returns branch. Tr. at 128, 153.

The GESC did not refer to the specific evidence on which it relied to support its

---

**12.** Monsanto's letters expressed dissatisfaction over the fact that employees whom he had once supervised had been promoted to positions above him.

**13.** Commissioner Quinn testified that although he signed the performance reports he had qualms about the ratings at the time, but had no authority to change the rating by the immediate supervisor. Tr. at 46. He also made a

general allegation that Monsanto's "production was below par," Tr. at 63–64, but no supporting evidence was produced. The evidence, as discussed in the text, is to the contrary. Citations to the transcript in this footnote and in the subsequent text are to the testimony before the GESC on October 1 and 9, 1979, unless otherwise noted.

conclusion of disruption. We have accordingly examined the record for evidence to support that conclusion. With regard to whether Monsanto's letter writing had a disruptive effect upon employment relationships among his co-workers and his supervisors and upon the regular operation of the Tax Division in general, the evidence was equivocal. The testimony as to the alleged disruption was in large part conclusory, and non-specific. Commissioner Quinn testified that as a result of a letter written about one co-worker, Lucia Thomas, she went on vacation and requested additional leave time "because she was unable to cope with the situation, returning to the office, there was so much dissention, [sic] so many problems." Tr. at 25. In addition, Commissioner Quinn referred in unspecific terms to disruption caused when Monsanto wrote about another unnamed employee. *Id.* Tax Director Olive, whom Monsanto characterized in his letters as incompetent as director of the division and whose removal was requested by Monsanto, Tr. at 87, testified the letters were "harrassing and disruptive" and that they affected him and his work: "The constant flow of letters continues to interfere with the other duties and responsibilities that I have that I'm responsible for in the performance of my daily duties." Tr. at 95. In describing the problems relating to Monsanto, Olive further testified:

> The problem is that he has been sending these letters; he is creating disruptiveness. As a result, perhaps fifty or sixty percent of the existing staff continues to find interruptions. They cannot function. They either refuse to work with Mr. Monsanto or they have gone their separate ways.

Tr. at 153. He provided no specific example of how reading seventeen letters in four years interfered with his performance of his duties, nor did he particularize any staff interruptions caused by the letters.[14] Remarkably, Olive further stated, however, that "there is currently no animosity between Mr. Monsanto and myself." Tr. (Nov. 9, 1979) at 19. Robert Woods, Chief of the Delinquent Accounts and Returns Branch characterized his working relationship with Monsanto as "good," but stated, without specifically citing the letter writing activity as the cause, that Monsanto's relationship with other employees was "strained." Tr. at 159–60. Lucia Thomas, a co-worker, testified that she was not on good terms with Monsanto, and referred specifically to her dissatisfaction over a letter Monsanto had written to Commissioner Quinn concerning an incident between her and Woods.[15] On cross-examination, however, Thomas admitted that she had not spoken with Monsanto for many years prior to the date the letter in question was written. Tr. at 187. Special Procedures Officer, Kenneth Hanson, whose position Monsanto had advocated in his letters should be abolished, testified that he had no grudge against or dislike for Monsanto. Tr. at 3–4 (Nov. 9, 1979).

There is no other testimony or evidence to support a finding of disruption caused by the writing or the release to the media of the letters or by playing of tapes of the Clarke broadcast in the office around lunchtime on a day following the broadcast.[16] Monsanto testified that he did not believe that his particular letters caused any disruption in the department and stated that he was not alone in writing letters concern-

**14.** Hanson's testimony about his efforts to discover the contents of Monsanto's letters by rummaging through his trash, Tr. (Nov. 9, 1979) at 7–8, must be attributed to Hanson's singular curiosity rather than to Monsanto's disruptive effect.

**15.** In this letter dated March 7, 1977 Monsanto recounted to Quinn his version of the facts surrounding a meeting between Thomas and Robert Woods. Tr. at 182–83.

**16.** Monsanto denied releasing the letters to the media, and making the tape of the broadcast which was subsequently played in the office. Tr. at 265–66; Tr. (Nov. 9, 1979) at 13–15. He also testified that he did not know about the Clarke broadcast prior to the actual broadcast. Tr. (Nov. 9, 1979) at 13. In view of our disposition of this case, we need not decide whether the GESC finding that Monsanto released letters to the media is supported by substantial evidence.

ing problems in the Tax Division. Tr. at 238.

We do not believe that the above evidence establishes that either the writing of the letters or their alleged release to the media had the effect of materially and substantially disrupting the operations of the Tax Division so as to warrant a conclusion that Monsanto's letters constituted unprotected speech. While there was ample testimony establishing disharmony and discontent among the employees of the delinquent accounts and returns branch, *see* Tr. at 169–70, 188, there is only meager evidence establishing that this disharmony and discontent was specifically caused by Monsanto's letter writing activities. The evidence supports Monsanto's testimony that several of his colleagues shared his views regarding problems in the Tax Division and likewise voiced their discontent in letters to Quinn and Olive. Tr. at 206–07, 234. Thus, much of the discontent appears to have been the result of the very problems in the Tax Division to which Monsanto's letters were directed, rather than a result of Monsanto's letter writing activity itself.

Furthermore, although the criticism in Monsanto's letters was directed at identified superiors, there was no evidence that Monsanto's employment relationships with these persons, such as Commissioner Quinn and the Tax Director, were the "kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering v. Board of Education*, 391 U.S. at 570, 88 S.Ct. at 1735. Monsanto's immediate superior, Robert Woods, described his working relationship with Monsanto as "good" and even Tax Director Olive likewise testified that no animosity existed between himself and Monsanto. Thus, unlike the situation considered in the *Sprague* case, there was little indication that the effectiveness of close, important working relationships was seriously undermined by Monsanto's activity. The GESC's decision to temporarily suspend rather than permanently dismiss Monsanto indicates that it likewise believed that key employment relationships between Monsan-

to and others in the Tax Division had not been permanently undermined.

It would appear that Monsanto's employers and the GESC may have been more concerned with the volume of Monsanto's letter writing than with its content. The GESC referred to Monsanto's activity as "pestiferous" speech. However, Monsanto's protected speech did not lose its protection merely because it was persistent. The attention of addressees or listeners can often be attracted in no other manner.

Finally, the letters were directed to public officials who had jurisdiction over and legitimate reason for concern about the allegations. Even if they were ultimately released by Monsanto to the media because they were apparently having no internal impact, their First Amendment protection is not thereby lost. The timing of Commissioner Quinn's decision to seek Monsanto's dismissal, less than ten days after the radio broadcast, suggests that it was the broadcasts rather than the letter writing as such which provoked this controversy. The appellee, however, produced no evidence to support the GESC's finding of disruption in that intervening ten-day period resulting from the broadcast.

■ Our review of the record convinces us that Monsanto's letter writing concerned issues of public importance, and that there is no evidence to support a finding that it had a substantial disruptive effect on the operations of the Department of Finance. We, therefore, agree with Monsanto that his letter writing activity constituted protected speech which could not permissibly furnish the basis for the sanction imposed.

■ Turning then to the second step of the three-step process required in examination of a public employee's claim of retaliation based on engagement in protected activity, *see* page 7, *supra*, we must consider if Monsanto has shown that the activity was a substantial or motivating factor in his suspension. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Without specifically referring

to the *Mt. Healthy* case, appellee appears to suggest that Monsanto's other conduct, in writing the letters during regular working hours and utilizing government stationery and secretarial services, was the basis for the imposition of sanctions. We can find nothing in the GESC's findings or opinion to indicate that the letter writing, which it had concluded was unprotected, was not considered in its imposition of the sanction. It is unlikely that the GESC would have imposed the harsh sanction of a ninety-day suspension from employment without pay based merely on the other, much more minor, charges. We conclude that the letter writing and/or release to the media was a substantial or motivating factor in the sanction imposed.

Appellee of course had the opportunity to defeat Monsanto's claim by showing that the same action would have been taken even in the absence of the protected conduct. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416-17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576. In its third and fourth factual findings, the GESC found that Monsanto wrote the letters during regular working hours using government stationery and secretarial services after being instructed to cease, and hand-delivered the letters to the office of the Commissioner during regular working hours. Monsanto contends that none of the GESC's findings, including these, were supported by substantial evidence. On the basis of our review of the record, we agree that the evidence to support these findings was insufficient to meet appellee's burden under *Mt. Healthy*.

Each of the letters in question was indeed written on stationery bearing the letterhead of the Tax Division. However, appellee has not pointed to any regulation which would preclude an employee's use of the division's stationery in writing to his or her supervisor about matters relating to the operation of the division.[17]

There is little evidence to support the GESC's finding that Monsanto wrote "numerous" letters utilizing government secretarial services "during regular working hours". Monsanto testified that the letters were written or typed either at his home or in the office before or after working hours. Tr. at 237–38, 250. Tax Director Olive verified that Monsanto was very punctual and usually arrived at work early. Tr. at 141. Commissioner Quinn acknowledged that the letter writing could have been done before the start of work or during Monsanto's lunch break. Tr. at 49. Kenneth Hanson testified that on March 22, 1978, he observed Monsanto typing a letter to Leslie Millin, at "around 2 o'clock" in the afternoon. Tr. (Nov. 9, 1979) at 7–8. Hanson testified that the typing lasted approximately fifteen minutes. Tr. (Nov. 9, 1979) at 8. The relevance of Monsanto's writing during "regular working hours" would be its effect on either his production or quality of work. Even if Hanson's testimony were fully credited, as we believe the GESC must have done, a fifteen minute use of working time by Monsanto must be viewed in light of the appellee's own evidence that Monsanto regularly arrived early, and the performance rating showing that his work was characterized by his employers as exemplary.

The only evidence adduced at the Commission hearing which was supportive of the finding of the use of secretarial services concerned two letters. Telsa Plaskett testified that during the time she served as administrative secretary for the Tax Division she typed two of the letters, dated February 7, 1977 and February 15, 1977, for Monsanto during working hours. Tr. at 197–99. This hardly supports a finding of the use of government secretaries for "numerous" letters.

With regard to the GESC's finding that the letters were hand-delivered to the office of the *Commissioner* by Monsanto during regular hours, there is no evidentiary support. Commissioner Quinn testified that at

---

**17.** Appellee has never contended that all that was involved here was a reasonable time, place

or manner restriction, and relied instead on his position that the activity was unprotected.

least one letter was hand-delivered to his office, but he did not specify by whom. Tr. at 17. There would be some basis for a finding that Monsanto delivered letters to Tax Director Olive since Olive testified that he received the letters during working hours. Tr. at 95. Cecelia Hill, an administrative officer in the Tax Division, testified that she had received correspondence from Monsanto for Tax Director Olive during working hours, Tr. at 193–94, and that the letters were hand-delivered by either Monsanto, whose office was "a few steps away" from hers, or Monsanto's co-worker, Mario Lima. Tr. at 196. As in the case of the fifteen minutes used for letter writing, the interruption in work occasioned by hand delivery of letters to an office a few feet away is obviously minor. We, therefore, conclude that the evidence produced by the appellee to support the GESC's findings with regard to Monsanto's hand-delivery and composition of the letters during working hours and utilization of government secretarial services failed to meet the burden of demonstrating that the ninety-day suspension without pay would have been imposed on Monsanto even in the absence of his engagement in protected activity.

We do not underestimate the internal unease or unpleasantness that may follow when a government employee decides to break rank and complain either publicly or to supervisors about a situation which s/he believes merits review and reform. That is the price the First Amendment exacts in return for an informed citizenry.

For the foregoing reasons, we will reverse the order of the district court and remand to the district court so that it may determine the amount of backpay, attorneys fees and costs to which the appellant is entitled.