Rosemary RAHN, Plaintiff–Appellee,

v.

DRAKE CENTER, INC., Defendant–
Appellant.

Nos. 92–4041, 93–3170.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 3, 1993.

Decided Aug. 8, 1994.

David G. Torchia (argued and briefed),
Tobias & Kraus, Cincinnati, OH, for plaintiff-
appellee.

Robert S. Brown (argued and briefed), Ka-
thryn K. Przywara (briefed), Brown, Cum-
mins & Brown, Cincinnati, OH, for defen-
dant-appellant.

Before: KEITH and NORRIS, Circuit
Judges; and ZATKOFF, District Judge.*

---

* The Honorable Lawrence P. Zatkoff, United
States District Judge for the Eastern District of
Michigan, sitting by designation.

ZATKOFF, District Judge, delivered the opinion of the court, in which ALAN E. NORRIS, Circuit Judge, joined. KEITH, Circuit Judge (pp. 415–16), delivered a separate dissenting opinion.

ZATKOFF, District Judge.

Defendant-appellant Drake Center, Inc. ("Drake Center") appeals several orders entered by the district court[1] in this 42 U.S.C. § 1983 action where plaintiff-appellee Rosemary Rahn ("Rahn") prevailed on her claim that Drake Center discharged her in violation of her First Amendment rights. Specifically, Drake Center appeals the denial of its directed verdict motion on the issues of state action and protected speech; the denial of its motion for judgment as a matter of law, or in the alternative, motion for a new trial on the issue of its affirmative defenses; the award of punitive damages to Rahn; three separate evidentiary rulings; and the award of attorney fees and costs. Finding that Rahn's First Amendment rights were not violated in this case, we REVERSE the district court and VACATE the judgment entered in this action. We do not reach the merits of the other issues raised in this appeal.

## I.

### A.

Rahn brought this § 1983 action claiming Drake Center discharged her in violation of her First Amendment rights. After the close of discovery, Drake Center filed a motion for summary judgment which was denied.

A jury returned a verdict in favor of Rahn, awarding her compensatory damages, as well as punitive damages. Judgment was entered on the compensatory damage portion of the verdict, while the district court reserved entry of judgment on the punitive damages until the issue could be fully briefed by the parties. Drake Center filed a motion for judgment as a matter of law, or in the alternative, a motion for a new trial, as well as its opposition to the punitive damage award. The district court denied Drake Center's motion in its entirety and entered judgment on the punitive damages award. Drake Center timely appealed (No. 92–4041). Thereafter, the district court entered judgment awarding Rahn attorney fees in the amount of $56,-244.00 and costs in the amount of $3,059.59. Drake Center timely appealed this judgment (No. 93–3170). The appeals were consolidated.[2]

### B.

In order to provide a proper context within which to discuss Rahn's claim that her First Amendment rights were violated, the following background is required. Prior to 1989, Daniel Drake Memorial Hospital ("DDMH"), a hospital established pursuant to Ohio Revised Code Chapter 339, was a public institution owned and operated by Hamilton County, a political subdivision of the State of Ohio. DDMH employed Rahn as a licensed practical nurse starting in 1982. In February 1988, DDMH hired a new administrator, Earl Gilreath ("Gilreath"), to institute major changes necessary to regain the hospital's accreditation and Medicare certification, which were lost in January and February 1988, in the wake of the "Donald Harvey incident."[3] DDMH obtained its reaccreditation and Medicare certification while Gilreath was the administrator.

In 1989, Hamilton County decided to cease operating DDMH and to lease the facilities to a private corporation pursuant to O.R.C. § 140.45. Gilreath was instrumental in orchestrating the change. Drake Center is a private nonprofit Ohio corporation, which

---

**1.** The parties consented to a final determination by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**2.** Drake Center's appeal of the award of attorney fees and costs is based upon their success in the appeal on the merits. Drake Center does not

otherwise dispute the award of attorney fees and costs.

**3.** Donald Harvey was a former nurse's aide who admitted to killing 24 patients at DDMH in 1987. Without its Medicare certification, DDMH was not able to admit seriously ill patients which comprised a majority of DDMH's admissions.

was created on May 17, 1989. On June 2, 1989, Hamilton County and the University of Cincinnati entered into a written agreement which provided for the continued operation of the DDMH facilities through a lease of the facilities to Drake Center and set forth the obligations of the parties. Sections 3.1 and 3.2 of the agreement provided that Hamilton County would agree to use its best efforts to pass the "Drake Hospital tax levy" in the Spring, 1989 (which was eventually passed) and to annually transfer the proceeds of the levy to Drake Center subject to the lease and operating agreement between Hamilton County and Drake Center.[4]

Gilreath was appointed the president of Drake Center and Chief Executive Officer. Gilreath assigned to Michael Costa, Drake Center's Vice President of Human Resources, responsibility for all personnel decisions, including hiring, disciplining, and firing employees, except the medical staff and the officers reporting directly to the President of the Board of Trustees. Rahn applied for and obtained the position of licensed practical nurse with Drake Center effective July 1, 1989.

Effective July 1, 1989, Drake Center established a three month orientation period for all of its employees, including all former DDMH employees it hired. Drake Center's Orientation Policy provided that "employees who accumulate three points (as specified in the attendance guide) will have employment terminated." Under the terms of Drake Center's Attendance Policy, employees with an unscheduled absence for one day are assessed one point. When employees do not give proper notice of such absence,[5] they are assessed two points. The section of the Attendance Policy titled "Absent No Show No Call" states that "a failure to report an absence for the entire scheduled shift shall be dealt with as a serious issue under the disciplinary policy."

On July 18, 1989, Rahn was assessed one point under the attendance policy for an un-

scheduled absence. According to the schedule that was printed on July 12, 1989—for the period July 16, 1989 through August 12, 1989—Rahn was scheduled to work the day shift on July 21, 1989. The day shift is 7:00 in the morning to 3:30 in the afternoon. On July 21, 1989, Rahn was assessed two points under the attendance policy for being absent from work without proper notice. Costa had the following written notice delivered to Rahn by courier at approximately 4:00 p.m. on July 21, 1989:

> The purpose of this letter is to advise you that you have accumulated three points for an unscheduled absence on July 19, 1989 [sic], and being absent without notice on July 21, 1989. Unscheduled absences and being absent without call can cause a problem delivering patient care. It is for this reason that employees in orientation who accumulate three points will have employment terminated. You were advised of Drake Center's orientation guideline on July 10, 1989.
>
> Please advise me or the Director of Nursing of any extenuating circumstances for which you should not be terminated under Drake Center's orientation guidelines as soon as possible but, no later than noon on July 22, 1989.

Rahn informed Drake Center, on July 22, 1989, that she was not aware that she had been scheduled to work on July 21, 1989. On July 25, 1989, Costa and Rahn discussed, via telephone, her failure to appear. Rahn again stated that she was not aware that she was scheduled to work and Costa responded that it was Rahn's responsibility to check the schedule.

On July 26, 1989, Costa directed a letter to Rahn, which included the following statements:

> The reason you gave for the July 21, absence, was that you didn't know you were scheduled [to work]. The schedule was posted July 12, you worked July 17, 1989. As you indicated, you realize that

---

4. Hamilton County and Drake Center also entered into the lease and operating agreement on June 2, 1989, providing that effective July 1, 1989, Hamilton County would lease the DDMH facilities to Drake Center.

5. Proper notice requires that the employee give notice at least one hour before the scheduled shift.

you are responsible for knowing your schedule.... The orientation guidelines indicate that an employee in orientation who receives three (3) points, will be terminated. Your employment is therefore terminated.

### C.

In 1989, Rahn worked at voting polls supporting the tax levy for the then Hamilton County operated DDMH. The tax levy passed. On July 1, 1989 an article appeared in a local newspaper quoting Gilreath as saying he intended to move 75% of Drake Center's patients to private facilities. Sometime after the publication of this article, a group known as the "Committee to Maintain and Improve Drake Hospital" ("the Committee") was formed. The group consisted of employees, patients, patients' family members, and local citizens. Rahn was the Chairperson of the Committee.

On July 18, 1989, the Committee prepared a press release to distribute to the University of Cincinnati, the Administrators of Hamilton County, Gilreath, and the media. Rahn delivered the typed press release at DDMH at approximately 3:30 p.m. on July 18, 1989.[6] The press release reads as follows:

Today, Rosemary Rahn, chairman of a committee including Drake Hospital Staff Members, Drake Hospital Patients, Families of Drake Hospital Patients and Citizens of Hamilton County, announced the formation of a committee to preserve the existing human resources, maintain the facility and encourage improvement at the "County Hospital."

The Donald Harvey incident and subsequent discreditation of the hospital by Medicare and Medicaid authorities has left the hospital in disarray. Adding fuel to the fire of confusion and discontent has been the appointment by Hamilton County Commissioners of Earl Gilreath to resolve the discreditation problem and to spearhead the passing of the most recent bond issue. To give the "Devil" his due, Mr. Gilreath attained the recreditation of Drake Hospital and the passing of the most recent bond issue. However, Mr. Gilreath and his assistant Michael Bradford's strong arm and closed door tactics in the operation of the hospital at this time must be exposed to the glare of sunshine.

Mr. Gilreath has gathered "his" people in the administration to attain his personal desires for the direction of the County hospital, which has historically served the needs of County residents in need of long-term rehabilitation and care. Contrary to this long-standing purpose of the County hospital, Gilreath has been heard to say, "I'll use that $100,000,000 bond issue money over the next five years any way I want to." Further, he has said, "I've built a wall between the University of Cincinnati and Drake Hospital—they will only be sending patients and residents to the County Hospital." He has intimated he will maintain complete control over Drake along with the help of his carefully selected henchmen.

Mr. Gilreath and his assistant Michael Bradford perceive the "New Drake" as a "Private Hospital" which is not subject to the scrutiny of citizens of Hamilton County who have just voted in a $20,000,000 per year bond levy for the next five years. The question is, did the citizens vote for a private country-club like facility lavishly landscaped with expensive flowers after Mr. Gilreath had previously ordered all existing plantings removed for the front of his hospital or a facility to provide long-term care and therapy for the more needy citizens of Hamilton County?

Was the voters' approval of the Bond Levy a mandate to purge all the existing staff and patients at Drake Hospital. *WE HOPE NOT!!!*

This Committee hopes for clarification and the reasons for actions in the following areas:

(1) New work rules which have caused widespread discontent among the hospital staff which has created a high absenteeism, possibly developing a patient endangerment situation.

---

6. Rahn was scheduled to work on July 18, 1989.

(2) Failure of the administration to publish the short and long range goals for the hospital and a complete disregard for the input that the hospital staff, patients and relatives and citizens of Hamilton County might have to make.

(3) Failure to disclose the actions and philosophies of the new Hamilton County—University of Cincinnati corporation formed to operate the hospital.

(4) A desire to have specific information about the staffing, budget and desired patient mix provided by the administration instead of glittering generalities and honeycoated, meaningless slogans.

(5) The desecration of employee benefits and retirement funds without counseling with the staff prior to making changes. This move has again created widespread discontent among the hospital staff.

Specific examples of indiscretions of Gilreath and his group are listed in an exhibit attached to this release.

The Committee has made this information available to the new Drake Hospital Board of Directors, Mr. Thomas Wenz, Hamilton County Administrator, Dr. Joseph A. Steger, President of the University of Cincinnati, and Dr. Donald C. Harrison, Senior Vice–President, University of Cincinnati Medical Center.

The Committee is calling for an immediate open meeting among the County Commissioners, University of Cincinnati officials, Drake Hospital Administrators, and the Citizens of Hamilton County, Drake Hospital Staff, Drake Hospital Patients and Relations to discuss matters set forth in the press release along with the operating statistics, budget and patient goals of the hospital.

Questions may be directed to the Chairman, Rosemary Rahn, at.... Ms. Rahn will attempt to present this press release at Drake Hospital to Administrator Gilreath at 4:30 p.m. today, July 18, 1989, and ask for the Administrator's resignation and a new, progressive, positive and capable Administrator. (emphasis in original).

Rahn also appeared on a local television station's evening news program that night. A jury returned a verdict in favor of Rahn,

finding that Drake Center discharged Rahn not because she had accumulated 3 points under the Attendance Policy, but for Rahn exercising her First Amendment rights in the press release.

## II.

■ For the purpose of this appeal, this Court will assume that state action is present. The determination of whether a plaintiff has been terminated for exercising her First Amendment right requires a two-step process. *Williams v. Commonwealth of Kentucky*, 24 F.3d 1526, 1534–35 (6th Cir. 1994). "The threshold inquiry is whether the speech that [plaintiff] cites as the basis for her removal and discharge may be fairly characterized as constituting speech on a matter of public concern." *Id.* at 1534 (quoting in part *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987)) (internal quotation marks omitted). *See also Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983). Whether a plaintiff's speech addresses a matter of public concern is a question of law, requiring de novo review by this Court. *Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir.1988). If a plaintiff's speech did not address a matter of public concern, no further inquiry is necessary. *Id.*

However, if any part of an employee's speech, which contributes to the discharge, relates to matters of public concern, the court must conduct a balancing of interests test as set forth in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See Rankin*, 483 U.S. at 384, 107 S.Ct. at 2897; *Connick*, 461 U.S. at 149–50, 103 S.Ct. at 1691–92. The court, as part of the ultimate issue of whether the speech is protected, is required to:

"balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Connick v. Myers*, 461 U.S. 138,

140, 103 S.Ct. 1684, 1686–87, 75 L.Ed.2d 708 (1983). This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment. On the one hand, public employers are employers, concerned with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. On the other hand, "the threat of dismissal from public employment is ... a potent means of inhibiting speech." *Pickering*, 391 U.S. at 574, 88 S.Ct. at 1737. Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of the employee's speech.

*Rankin*, 483 U.S. at 384, 107 S.Ct. at 2897.

■ Here, Drake Center's sole attack is on whether the press release addressed a matter of public concern.[7] The determination of whether Rahn's statements contained in the press release addressed matters of public concern must be based on the content, form, and context of the statement, as revealed by the whole record. *Id.* 461 U.S. at 146–48, 103 S.Ct. at 1689–91. In order to qualify as addressing a matter of public concern, this court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community. *Id.* In addition, the entire speech of the employee does not have to address matters of public concern, as long as some portion of the speech touches upon matters of public concern. *Connick*, 461 U.S. at 149, 103 S.Ct. at 1691.

■ The complete record in this appeal reveals that the press release does not touch upon matters of public concern. The crux of Rahn's argument is that the public was presented with a tax levy to help support

DDMH when it was purely a public institution. After the levy passed, a private corporation, Drake Center, was formed to manage DDMH. As stated by plaintiff's counsel during oral arguments, Drake Center, the private entity, never would have come into existence without the tax levy being passed. And now Gilreath was going to spend the taxpayers' money any way he wanted, and not necessarily in the best interest of the taxpayers. In addition, Rahn contends because the press release addressed "patient endangerment" that it addressed a matter of public concern.

This Court in *Barnes v. McDowell*, 848 F.2d 725 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989), cited with approval *Murray v. Gardner*, 741 F.2d 434 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985), where the District of Columbia Circuit held that since matters involving public monies and government efficiency may be raised in connection with virtually any public employment matter, they could not be used to convert an issue into one of public concern within the stricture of *Connick*.

> We agree with the District of Columbia Circuit's reasoning in *Murray*. The mere fact that public monies and government efficiency are related to the subject of a public employee's speech do not, by themselves, qualify that speech as being addressed to a matter of public concern.

*Barnes*, 848 F.2d at 734.

Here, the fact that Rahn believed that the money was not being spent in a wise fashion, by itself, is insufficient to find that the press release addressed a matter of public concern. In addition, the reference to "patient endangerment" does not make this a matter of public concern under the facts in this case. The only mention of patient endangerment in the press release is located in the following paragraph: "New work rules which have caused widespread discontent among the hos-

---

**7.** At trial, Drake Center argued even if the press release touched upon a matter of public concern that Drake Center discharged Rahn due to the accumulation of 3 points under the Attendance Policy. Thus, Drake Center did not argue at the trial level, or on appeal, that under the *Pickering* balancing test its interest in operating the hospital outweighed Rahn's interest in making the statement. As noted above, the jury found that Drake Center discharged Rahn because of the press release and not because she had accumulated 3 points under the Attendance Policy.

pital staff which has created a high absenteeism, possibly developing a patient endangerment situation." The focus of this comment is not on patient endangerment arising from the misapplication of tax dollars; rather, the focus is on the employees' discontent with new *work* rules which *might* lead to a patient endangerment situation. This is "nothing more than [an] example[ ] of the quintessential employee beef: management has acted incompetently." *Barnes,* 848 F.2d at 735.[8]

The conclusion that the press release did not touch upon matters of public concern also is not changed by the fact that the statement was made in a press release or that a local television station interviewed Rahn. In *Matulin v. Village of Lodi,* 862 F.2d 609 (6th Cir.1988), this Court held that statements made by a public employee which were printed in a newspaper were deserving of First Amendment protection because, in part, the media covered the story and as a consequence the employee's statement touched upon a matter of public concern. *Id.* at 613. The *Matulin* Court reasoned that although the employee may have a personal stake in the substance of the interview, the "finding of public concern is ... strengthened by the fact that the plaintiff did not solicit the attention of the media, but simply responded to questions regarding an existing controversy." *Id.* Unlike the plaintiff in *Matulin,* who was contacted by a newspaper and did not herself initiate the interview, Rahn issued the press release to the media in an attempt to obtain media exposure when she delivered it to DDMH in the afternoon of July 18, 1989. Under these circumstances, the fact that a local television station reported the issuance of the press release on its local news that night, does not change the conclusion that the press release did not touch upon a matter

of public concern, because Rahn initiated the contact with the media.

Moreover, this is not a case where the public employee has "uncovered" a fraud being committed on the taxpayers. *Cf. Solomon v. Royal Oak Twp.,* 842 F.2d 862, 865 (6th Cir.1988) ("This Court has held that speech *disclosing* public corruption is a matter of public interest and therefore deserves constitutional protection.") (citations omitted) (emphasis added). The relationship between Hamilton County, University of Cincinnati, and Drake Center was the subject of various newspaper articles before the press release was issued. In addition, the fact that Gilreath sought to make 75% of the beds private also was disclosed in an earlier newspaper article. Therefore, the press release did not "disclose" any public corruption. The public was aware of the facts.

During oral argument, counsel for Rahn stated that Rahn was exposing corruption because the landscaping contracts were awarded to the Administrator's wife. The press release, however, did not mention this. The press release merely stated that new landscaping had been done at the hospital and questioned whether this was money well spent. There is no evidence linking any of the allegations to corruption at Drake Center. As the *Barnes* Court noted:

> While Thompson may have been justified in his beliefs that his section of the Business Enterprises Program did not receive enough of the operating budget, that the Program should have had a 24–hour repair deadline before he instituted one and *that the wisdom and propriety of some of the Program's purchasing practices was questionable, he presented no evi-*

---

8. Rahn relies on *Monsanto v. Quinn,* 674 F.2d 990 (3rd Cir.1982) in support of her position that possible patient endangerment is a matter of public concern. *Monsanto,* however, is easily and significantly distinguishable from the instant appeal. In *Monsanto,* an employee of the tax division of the Virgin Islands wrote several letters to the head of the tax division. At least one of the letters stated that several employees of the tax division had attempted to defraud the government by filing fraudulent tax returns. The employee claimed that these problems in the tax division were impairing the effectiveness of the

division's tax-collecting operations. *Id.* at 991. The Third Circuit held that the letters touched upon matters of public concern, because they exposed corruption and inefficiency.

Here, on the other hand, the press release did not disclose any fraud being committed. In addition, the press release speculated that the new work rules *might* create a possible patient endangerment situation. The press release did not state that a patient endangerment situation existed at the present moment. Therefore, Rahn's reliance on *Monsanto* does not change this Court's conclusion.

*dence linking any of these charges to corruption in the Bureau or in the Program.* Consequently, instead of having addressed a matter of public concern, Thompson's complaints appear to be nothing more than examples "of the quintessential employee beef: management has acted incompetently."

*Id.* at 734 (citation omitted) (emphasis added).[9]

As was the case in *Barnes,* the press release before this Court is most accurately characterized as an employee grievance concerning internal office policy. This is best illustrated by examining the five areas on which the Committee sought clarification. The first area was "New work rules which have caused widespread discontent among the hospital staff which has created a high absenteeism, possibly developing a patient endangerment situation." There is no tenable argument that this is anything else besides an employee grievance with the new administration. The second area addressed the "[f]ailure of the administration to publish the short and long range goals for the hospital and a complete disregard for the input that the hospital staff, patients and relatives and citizens of Hamilton County might have to make." Again, the key here is the lack of input from the hospital staff on the goals of the hospital. It can always be claimed that the citizens might wish to have some input on the goals of the public institution. In almost every public employee case brought under the First Amendment, the employee could contend that the public might wish to air their views on the goals of any public institution.

The third area addressed the "[f]ailure to disclose the actions and philosophies of the new Hamilton County—University of Cincinnati corporation formed to operate the hospital [Drake Center]." In this case, this statement is most accurately characterized as the employees complaining about the new administration and the changes in the work rules. The fourth area dealt with "[a] desire to have

specific information about the staffing, budget and desired patient mix provided by the administration instead of glittering generalities and honeycoated, meaningless slogans." Again, this statement reflects the employees' dissatisfaction with the new administration and does not touch upon a matter of public concern. Finally, the fifth area the Committee sought clarification on was "[t]he desecration of employee benefits and retirement funds without counseling with the staff prior to making changes. This move has again created widespread discontent among the hospital staff." The fifth area underscores the conclusion that this press release relates to matters of the employees' interest at Drake Center and does not relate to matters of public concern. The overall tone of the five areas of interest in the press release reveal that the press release is an employee grievance, couched in a press release from the "Committee."

Moreover, the press release characterized Gilreath as "the devil" and asked for his resignation "and a new, progressive, positive and capable Administrator [to be named]." This language also supports the conclusion that this press release was actually the quintessential employee beef from disgruntled employees.

Thus, despite Rahn's assertion to the contrary, the press release, while from the Committee, did not address the interest of non-employees with respect to improving DDMH. Rather, Rahn spoke for herself and other employees through the Committee. Finally, the mere fact that the Committee was seeking an open meeting with "the County Commissioners, University of Cincinnati officials, Drake Hospital Administrators, the Citizens of Hamilton County, Drake Hospital Staff, Drake Hospital Patients and Relations" does not change the outcome in this case. In almost any public employee case, the public employee can assert that he or she wishes an open meeting with the governmental agency and the citizens of the local community to

9. The district court held that the press release could fairly be read to support a conclusion that it charged Gilreath with corruption. For the reasons set forth in the text, this Court finds that the press release cannot be fairly read as charg-

ing Gilreath with corruption. At best, the press release charges Gilreath with not spending money in a wise fashion with respect to the landscaping of the hospital. This does not constitute a matter of public concern. *See Barnes, supra.*

discuss the issues. Thus, this is not very relevant in determining whether this is a matter of public concern.

Thus, this Court finds that the press release did not touch upon a matter of public concern, and therefore was not deserving of First Amendment protection.

## III.

Accordingly, we REVERSE the district court and VACATE the judgment entered in this action.

KEITH, Circuit Judge, dissenting.

While the majority opinion correctly cites the applicable law in the instant case, I disagree with the conclusion that the speech contained in Rahn's press release was not a matter of public concern. The majority's painstaking consideration of each element of Rahn's press release disregards the impact of the press release as a whole and the context in which it was written. Because the press release addressed a matter of public concern, it is entitled to First Amendment protection. I, therefore, respectfully dissent.

Whether speech addresses a matter of public concern is determined by examining the "intent, form and context of a given statement as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Speech addressing matters of public concern encompasses "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *McKinley v. Eloy*, 705 F.2d 1110, 1114 (9th Cir.1982) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940)).

Here, although the press release noted certain employee grievances, a substantial portion addressed matters of public concern. For example, Rahn's speech attacked the management of Drake Hospital, the local hospital which provided services to the indigent. The attack discussed a recent tax levy

that provided funds for Drake Hospital. After the levy was passed, Drake Center corporation was formed to manage Drake Hospital. Rahn's speech directly addressed Drake Center's and Gilreath's use of tax levy dollars to manage the hospital.

As the majority notes, the fact that speech concerns government expenditures and efficiency does not automatically qualify speech as addressing a matter of public concern. *See Barnes v. McDowell*, 848 F.2d 725, 733 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989). In the instant case, however, the press release discussed the management of Drake Hospital, the formation of the Drake Corporation, and the conversion of 75% of the hospital beds to private status. All of these topics received substantial media attention in the summer of 1989. They certainly were extremely important to the locality, and are thus worthy of First Amendment protection.

While media coverage itself does not convert a private matter into a matter of public concern, it provides evidence that the matter is of import to the locality. Moreover, the speech also addressed the potential endangerment of patients which is clearly a matter of public concern. *See Frazier v. King*, 873 F.2d 820, 825–26 (5th Cir.) (agreeing "the quality of health care given to any group of people, including inmates, is a matter of public concern"), *cert. denied, Davoli v. Frazier*, 493 U.S. 977, 110 S.Ct. 502, 107 L.Ed.2d 504 (1989); *see Smith v. Cleburne County Hospital*,[1] 870 F.2d 1375, 1383 (8th Cir.1989), *cert. denied*, 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 100 (1989); *see also Casey v. City of Cabool, Mo.*, 12 F.3d 799, 802–03 (8th Cir. 1993) (holding criticism of public officials during a discussion of city policy was a matter of public concern).

Clearly, health care is important to the American public. Perhaps the most important political debate of the 1990's is the interplay between health care and the public's tax dollars. This debate has raged both nationally and locally, and definitely involves mat-

---

1. Notably in *Cleburne*, the Eighth Circuit determined a doctor's initial criticism of a local hospital was a matter of public concern. *Cleburne*, 870 F.2d at 1381. The court further found, however, that to the extent the speech was per-

sonal and spiteful attacks against individuals, it was disruptive and unprotected, and therefore, provided an independent basis for recommending the suspension of the doctor's privileges. *Id.* at 1383–84.

ters of public concern.[2] Notably, the Third Circuit discussed health care and found that "the quality, availability and cost of health care are among the most important and debated issues of our time." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 917–19 (3rd Cir.1990).

The debate over the provision of and payment for health care squarely falls within the heart of the First Amendment. Its protection should extend to the debate on health care reform, even where it occurs at a local level, as in the instant case.

Viewing the intent, form, and context of Rahn's speech as revealed by the whole record, I would conclude the speech was a matter of public concern, and therefore, entitled to protection.

**2.** *See also* Symposium, *The Law and Policy of Health Care Rationing: Models and Accountability,* 140 U.Pa.L.Rev. 1505 (May 1992); Susan Elizabeth Powley, *Caring for the Nation—Current Issues in Health Care Reform,* 45 Vand.L.Rev. 869 (May 1992); Kenneth R. Wing, Symposium, *American Health Policy in the 1980's: The Legal Implications of Health Care Cost Containment,* 36 Case W.Res.L.Rev. 608 (1986); Charles D. Weller, Symposium, *"Free Choice" as a Restraint of Trade in American Health Care Delivery and In-* surance, 69 Iowa L.Rev. 1351 (July 1984); David Lauter, *Clinton Challenged on Cost of Health Care to Employers,* L.A. Times, April 8, 1994, at A17; Gerald F. Seib, *Clinton's Choice: Left or Right in Health Care?,* Wall Street Journal, Nov. 24, 1993, at A18; Sara Fritz, *U.S. Cautiously Awaits Clinton Health Program,* L.A. Times, Sept. 19, 1993, at A1; Joseph F. Sullivan, *Health Care Program Endorsed,* New York Times, Nov. 6, 1991, at B6 col. 1.