**Dr. Wayne SMITH, et al., Plaintiffs,**

v.

**CLEBURNE COUNTY HOSPITAL, et al., Defendants.**

**No. B–C–77–49.**

United States District Court,
E.D. Arkansas, N.D.

Feb. 14, 1985.

John Lavey, Little Rock, Ark., for plaintiffs.

G. Ross Smith, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Plaintiff, Dr. Wayne Smith, instituted this proceeding on the 26th day of April, 1977, asserting that the defendants, Cleburne County Hospital, the Board of Governors—V.H. Dickson, Chairman, County Judge Delane Wright, Ex-Officio Member, Larry Crabtree, Secretary, D.E. Barnett, Thomas Whitaker, J.M. Stuart, B.J. McNair and Oscar Patchell, members—and the Medical Staff consisting of Doctors William M. Wells, Michael E. Barnett, Max Baldridge, William H. Nevins, Nathan L. Poff, Donald H. McClanahan, Harral L. Cranford, Joe B. Scruggs, Robert Clark, Steve Blackburn, Jim Ashabramer, Robert R. Wilson and H.C. Williams, denied him medical staff privileges at the Cleburne County Arkansas Hospital because of public and private statements he made criticizing the quality of medical service afforded patients at the hospital and recommending that the standard of patient case be improved all in violation of his right to free speech as secured under the First and Fourteenth Amendments to the Federal Constitution.

Defendants, on the other hand, have asserted that Dr. Smith voluntarily withdrew from the medical staff of the hospital and further, pursuant to this Court's order directing Dr. Smith to invoke available administrative remedies, defendants denied Dr. Smith's application for reinstatement because of Dr. Smith's personality conflicts with the medical and nursing staff, and the likelihood that the quality of patient care would be diminished if he were reinstated.

The Court concludes that the termination of Dr. Smith's medical staff privileges at the Cleburne County Hospital was not voluntary, but was revoked by defendants because of Dr. Smith's public criticism of the standard of patient care at the hospital rather than confining his criticism "in house". In other words, defendants' action was in direct retaliation against Dr. Smith for engaging in First Amendment protected activity, as hereinafter discussed and analyzed.

Plaintiff has asserted the following jurisdictional grounds: 28 U.S.C. §§ 1343(3) and 1343(4); 42 U.S.C. §§ 1983 and 1985(3). This action was initially instituted as a class action in behalf of doctors, nurses and medical care patients in Cleburne County, but proceeded to trial as an individual action.[1]

## RELEVANT FACTS

The Cleburne County Hospital is a facility owned and operated by Cleburne County, Arkansas, and affords extensive medical and surgical services to residents of Cleburne County.

The business affairs of the hospital are under the supervision and control of a Board of Governors consisting of eight persons—a chairman, an ex-officio member who is the incumbent county judge, a secretary and five members. The Board of Governors, pursuant to the by-laws of the Cleburne County Hospital are appointed by the county judge.[2]

---

1. The issues have been bifurcated. Accordingly, the Court will address the question of liability in this memorandum opinion and after affording the parties an opportunity to stipulate to the relief to be afforded, the Court will, if necessary, schedule a hearing on the question of relief to be accorded Dr. Smith.

2. The Board of Governors derives its authority from the laws of the State of Arkansas (Ark.Stat. Ann. §§ 17–1501 through 17–1506) and the constitution and bylaws of the Cleburne County Hospital.

The administrator is the chief executive officer who is responsible for the management and day to day operation of the hospital.

The duties of the Board of Governors are:

(a) To adopt suitable by-laws.

(b) To select a competent hospital administrator and exercise general supervision over his duties.

(c) To approve the policies established by the hospital administrator.

(d) To approve the equipment and facilities necessary for the proper operation of the hospital.

(e) To select and approve competent and qualified medical staff and exercise general supervision over their duties and responsibilities.

(f) To approve the policies and recommendations of the medical staff.

(g) To require accepted recognized professional medical standards in providing health care services.

(h) To require businesslike management of the financial affairs of the hospital and to employ an annual audit and to provide adequate financing by securing sufficient income.

(i) To review and act on the recommendations of all committees.

(j) To cooperate with the medical staff of the Cleburne County Hospital in the adoption and enforcement of the medical staff by-laws which shall contain, among other things, rules for granting and revoking staff appointments, granting, limiting and revoking professional privileges, election of medical staff officers, establishment of departments and committees and meetings thereof, patient care and preparation of patient records and teaching medical personnel.

(k) To attend to all other matters not enumerated but required by the law of the State of Arkansas.

The by-laws of the hospital further authorize the Board of Governors (Board) to establish a Joint Conference Committee consisting of a chairman, vice chairman, secretary of the Board, the chief administrator and the executive officers of the medical staff. The Joint Conference Committee is empowered to review recommendations and hear complaints from hospital personnel and staff physicians and submit to the Board the Committee's recommendations on those matters submitted for review.

The by-laws divide the medical staff into honorary, consulting, active, courtesy and dental members. The hospital medical staff members are appointed annually by the Board based on the recommendations of the members of the medical staff. The fiscal year of the hospital commences on October 1st and ends September 30th of each year. Thus, appointments to the medical staff are made on October 1st of each year and extends to September 30th.

The plaintiff, Dr. Wayne Smith, commenced the general practice of medicine in July, 1968, in Cleburne County, Arkansas. The Cleburne County Hospital is the only hospital where plaintiff has applied and acquired medical staff privileges.[3]

From October 1, 1972, to September 30, 1973, plaintiff served as Vice Chief of Staff of the hospital; and from October 1, 1973, to September 30, 1974, he served as Chief of the Medical Staff.

On or about July 2, 1976, plaintiff began to criticize the quality of the patient care at the Cleburne County Hospital. Plaintiff's complaints were discussed with the medical staff, the Board, the Chief Administrator of the hospital, citizens of Cleburne County and the local news media.

Plaintiff's public expression, and particularly his statements to the news media, were registered after considerable press coverage was given to public meetings held by concerned citizens and in response to public pronouncements by Board members and members of the medical staff. For example, the Arkansas Sun, in its Wednesday, October 27, 1976, edition reported that "three concerned citizens" advised the Board of a public meeting held by concerned citizens in Cleburne County "for the purpose of discussing the Cleburne County

3. The Cleburne County Hospital is the successor to the Heber Springs Hospital. The facility was renamed Cleburne County Hospital sometime after 1968.

Hospital." The matters discussed by the concerned citizens were: (a) complaints regarding the non-enforcement of by-laws with reference to surgical schedule at the hospital, (b) failure of nurses to attend to patients' needs; (c) concern about the finances of the hospital; (d) the decline in census of the number of patients; (e) concern "over worker morale, lack of communication and employee complaints"; (f) "public opinion of patient treatment which has to do with hospital operations and the medical staff"; (g) concern about "Dr. Smith's expressed plan to resign from the staff."

According to the news article, certain Board members acknowledged that there were problems at the hospital, but are "under correction. The reins were down on the ground, they have been picked up." (PX 69). Other Board members expressed surprise at the group's "meeting and their alarm."

The news article of October 27th, as well as other articles on the subject in the Arkansas Sun and the Cleburne Times, generated numerous letters to the editorial section of the local newspapers expressing views supportive of Dr. Smith and equally as many expressing support for the Board. These letters naturally created further interest in the patient care at the hospital resulting in additional meetings between Board members, the administrator and citizens of Cleburne County.

On December 20, 1976, the Board requested the Arkansas State Health Department to conduct an inspection and survey of the hospital facilities and the quality of patient care.

On December 23, 1976, the following statement appeared in the Cleburne County Times which was endorsed by ten physicians who possessed staff privileges at the hospital:

The Cleburne County Hospital has received criticism from one member of the Medical Staff during recent weeks. We would like to make it clear to our patients, and to all county residents, that we are proud of our hospital and its employees. We feel confident that the majority of the Medical Staff gives their full cooperation and support to the Hospital Board of Governors, the Administrator, and other employees. We feel that our patients receive care that is not only adequate, but in many instances, superior, compared to other hospitals in the state. We feel that the majority of the nursing personnel at Cleburne County Hospital are dedicated, efficient and compassionate human beings. Finding fault is never difficult to do in any institution, and ours is no exception. However, we are determined to see that the faults we find are cured as quickly as possible by working within the organization, not by withdrawing from it.

We expect our patients to tell us if they find a problem at our hospital which has escaped our attention, secure in the knowledge that we will do our best to keep problems to a minimum and to correct those quickly which are found.

As taxpayers, you have every right to expect that a modern, clean, well-equipped, well-staffed hospital is provided for you, and that that hospital is managed in a business-like, efficient manner. We feel that your expectations are fulfilled in our hospital.[4]

The initial criticism registered by Dr. Smith regarding the inadequacy of patient care at the hospital was between April and July of 1976 when Dr. Smith submitted a

4. On January 26, 1977, Dr. Smith issued the following statement:

It is with deep disappointment that I see this Board acting in a manner that is detrimental to this hospital and to the health and well-being of the citizens of this county. I have expressed my opinion to the Board and individual members in the past, so will not belabor the point now. I do wish to assure you and the people of this county that I have only just begun to fight. I will not resign from the medical staff, and I will use every legal means that are available to me to insure that the hospital becomes a properly managed institution. I still hope that this Board or Judge Wright will correct problems that exist. Believe me, they will be corrected—through legal action by civil suit if necessary.

statement to the Board setting forth nineteen items of deficiencies. In November, 1976, Dr. Smith sent a letter to all of his patients and the Board stating that unless the Board conducted a thorough investigation of the hospital's operations, he would resign from the medical staff in April, 1977. Two of the specific complaints mentioned by Dr. Smith were: (1) The failure of doctors to abide by surgery schedules and (2) poor nursing care.

On December 29, 1976, Dr. Smith wrote a letter to Board members Dickson, Reed, Crabtree, Barnett and Whitaker, stating essentially that the hospital is "very inadequate" and that their indifference contributes to the problem and that each, in effect, should resign from the Board.

On January 27, 1977, Dr. Smith, during a Board meeting, stated that unless the Board took immediate steps to resolve the problems at the hospital, he would take the matter to court and further indicated his interest in seeking the public office of Cleburne County Judge.

On February 1, 1977, after the requested survey was conducted, the Arkansas Department of Health sent the following communication to the Administrator of the hospital:

Dear Mr. Rector:

Reference is made to an inspection of Cleburne County Hospital on January 31, 1977 by representatives of this Division. The following items are noncompliances with the Rules and Regulations for Hospitals and Related Institutions in Arkansas:

I. Dietetic Services:

1. The hot food for the noon meal of January 31 was prepared too far in advance of the meal to be served.

2. The pot washing procedures were incorrect as only two vats of the three compartment sink were used for wash and rinse. The temperature of water for rinse registered 155°F. and the temperature should be 170°, preferably 180°F.

3. Cartons of milk in the refrigerator were observed to be outdated.

II. Medical Staff:

1. All phone orders are not co-signed within 24 hours. According to Medical Staff by-laws and Arkansas Rules and Regulations for Hospitals all phone orders must be co-signed within 24 hours by the physician making the order.

III. Medical Reports: None

IV. Pharmacy:

1. Drug cabinets and refrigerators on the Nursing Units have not been thoroughly checked by the pharmacist and nurses. Some out-dated drugs were found in each of these drug storage areas: the nurses' station, Coronary Care crash cart, Operating Room, Emergency Room, and the infant emergency tray for the Delivery Room.

2. Locked storage was not provided for drugs, including some controlled substances, in the Delivery Room and the Operating Room. This is especially important because these areas are unattended two shifts a day.

3. Pharmacy records did not include quantities dispensed as floor stock or as individual patient drugs. Adequate control must be maintained on prescription drugs through complete records.

4. Six of nine current charts reviewed indicated that stop order policies were not being followed. None of the patient charts had notes on the front asking the doctor whether certain drugs were to be discontinued or reordered.

5. The Pharmacy and Therapeutics Committee has held only two of the required quarterly meetings (January and November, 1976).

V. General Administration & Physical Plant:

1. The By-Laws of the Governing Body should be amended by amendment to include an overall statement of an overall admission policy for the facility using part II, Section I, Para C–8,

Rules and Regulations for Hospitals in Arkansas as a guideline.

2. There was observed some electrical medical equipment wired with two wire power cords. All equipment wired with two wire power cords should be rewired with a three wire power cord to provide a grounded circuit.

3. There was infant cribs, a stretcher and a crash cart stored in the O.B. area corridor. Egress should not be hampered in any corridor and corridors should be maintained open and unobstructed at all times.

VI. Nursing Service:

1. Unused medications or special prescriptions that do not meet sterile or label requirements shall be returned to the pharmacy or drug room. Several outdated drugs were found in the Emergency Room (Opthalmics) and Operating Room (Pentathol and used I.V. mixtures in the refrigerator). Nursing personnel in these areas should check expiration dates in the future.

2. A registered nurse shall be present as a circulating nurse during each delivery. In the past as indicated by the Delivery Room Register an L.P.N. has functioned in this position. This practice should be corrected in the future.

VII. Laboratory:

1. Refrigerators used for storing blood should be monitored for correct temperature. A refrigerator in surgery, which was sometimes used for storing blood, had no record of the correct storage temperature being verified.

VIII. Respiratory Therapy—None

IX. Infection Control—None

X. Radiology—None

The above deficiencies should be corrected at the earliest possible date in order to provide maximum care and/or safety to the patients in your hospital. It would be appreciated if your comments on the above could be forwarded to this office within the next 60 days or as soon thereafter as may be practicable. Such comments should include any corrective action taken or proposed resulting from our findings.

If we can be of further assistance in respect to the above or in any other way, please let us know.[5]

On February 9, 1977, Dr. Smith announced his candicacy for county judge in the 1978 election. He stated his candidacy would enable him to take the hospital problem to the people. Specifically, Dr. Smith stated that the following matters would be addressed during his candicacy:

1. Why does the County Judge refuse to say publicly what he says privately?

2. Why has the Board refused to investigate very specific allegations?

3. Why does the Board not supervise the hospital as it should?

4. Why does the Board allow the County Judge to run business that is supposed to be the practice of the Board?

5. Why does the Board refuse to supervise the medical staff as it should?

6. Why does the Board not wish the residents of the county to know what goes on?

7. Why does the Board tell residents of the county that the hospital problems are none of their business?

8. Why did the Board hire a man for administrator who is totally without qualifications for the job?

9. Why do these men insist on remaining on the Board when they obviously aren't doing their job?

10. Why does the administrator insist on staying with the job when he obviously isn't doing the job?

11. Why has the Board become synonymous with Cleburne County Politics, leaving out the G.F. (Greers Ferry) area?

12. Why does the medical staff not act like a medical staff?

---

**5.** The Director of the Division of Hospitals also sent to the administrator, under separate cover, written recommendations to be implemented at the hospital. The recommendations are attached to this opinion and designated as Appendix I.

13. Why does the medical staff accept pay from the hospital for E.R. (Emergency Room) coverage, yet not want to cover it?

14. Why can't the nurses be indoctrinated and properly trained?

15. Why do my critics not speak up officially and do something about me, if I'm so wrong?

16. Why do citizens of the county not speak up?

17. Why do I call his a rotten political mess?

On February 22, 1977, after concluding that the investigation conducted by the Arkansas Department of Health did not support D. Smith's claims of improper patient care, the medical staff recommended, by way of resolution, to the Board that Dr. Smith's staff privileges be temporarily suspended pending resolution of the controversy and peer review of Dr. Smith's conduct by all physicians on the medical staff.

The Board appointed a committee to implement the intent of the resolution, but took no action on the recommendation. The committee requested the Ethics committee of the Arkansas Medical Society to investigate the controversy between Dr. Smith and the defendants. The Society declined to get involved in the controversy concluding that the problem appeared to be essentially a personality conflict.

On March 18, 1977, Dr. Smith advised the Administrator that he would not, on advice of counsel, participate in hospital activities, including emergency room duties.

On April 15, 1977, the United States Department of Health, Education and Welfare, Food and Drug Administration informed the Administrator of certain deficiencies of the Hospital's Blood Bank program.[6] Among other things, the deficiencies consisted of:

1. Failure to test each donation of Whole Blood (Human) for HBsAG by a method of sufficient sensitivity, i.e. third generation sensitivity, in that records to not indicate units drawn from donors # 110 and # 111 were tested prior or after transfusion.

2. Failure to keep proper blood processing records, including results and interpretation of all tests and retests.

3. Failure to maintain complete records of emergency blood transfusion including complete documentation justifying the emergency action which is signed by the physician requesting the procedure.

4. Failure to maintain complete records in the performance of significant steps in the collection of units of Whole Blood (Human) in that some donor records observed did not contain answers to all medical history questions as well as donor signature at time of each donation.

5. Blood bank personnel were unfamiliar with FDA regulations.

6. Failure of donor records to document questioning donor of exposure within the last six months to an individual having viral hepatitis.

7. Failure to examine donor's arms and forearms for skin punctures or scars indicative of addiction to self-injected narcotics.

8. Failure to label a Group O Blood with a statement indicating whether or not isoagglutinin titers or other tests to exclude so-called "dangerous" Group O bloods were performed.

9. Failure to label units collected to indicate the date of expiration.

10. Failure to label emergency collected units that are issued for transfusion to indicate whether or not the serological test for syphilis and the test for hepatitis B surface antigen were performed prior to issue.[7]

6. The Department's Report and the Hospital's response indicating that correctional measures had been taken are attached to this opinion and designated as Appendix II.

7. According to plaintiff's Exhibit 125 which was introduced by agreement of counsel, during the weeks of January 11th, February 8th, March 8th, April 11th, May 9th, June 13th, July 11th, August 15th, September 12th, October 10th, November 14th, December 12th, 1976, and January 9th and February 13th, 1977, the following occurred at the emergency room of the hospital:

On April 26, 1977, plaintiff filed this lawsuit. In 1978, plaintiff moved his medical practice from Heber Springs to Hardy, Arkansas.

The trial of this action was scheduled for September 14, 1981. Defendants persisted that plaintiff had voluntarily abandoned his staff privileges and that defendants were not responsible in way. The Court, over the objections of plaintiff, stayed the action for sixty days in order to permit plaintiff to exhaust administrative remedies under the by-laws of the Medical Staff.

On October 14, 1981, the Joint Executive Committee of the hospital conducted a hearing to determine whether plaintiff should be granted active staff privileges. The committee, concluding that plaintiff's criticisms of the patient care at the hospital was detrimental to the interest of the hospital, that there were personality conflicts between plaintiff and the medical and nursing staff, and that the quality of medical services would diminish if plaintiff's staff privileges were restored, recommended to the Board that plaintiff be denied staff privileges. On November 13, 1981, the Board voted to accept the Joint Committee's recommendation.

## DISCUSSION

The crucial question confronting the Court may be stated as:

Whether the denial of medical staff privileges to the plaintiff on the basis of

the facts in this case constituted an infringement of plaintiff's right to freedom of speech as secured under the First and Fourteenth Amendments to the Federal Constitution.

In analyzing the criticism registered by plaintiff regarding the patient care offered at the hospital, the Court finds that such criticism did not become essentially public in scope until some of the defendants made public statements to the news media and placed advertisement in the local newspapers expressing their views regarding the controversy.[8] Initially, plaintiff voiced his complaints to the Board, medical staff members and his patients either orally or by written communication. Moreover, the thrust of plaintiff's criticism, both privately and publicly, was to persuade the Board to obtain a full scale investigation by an independent source into his allegations that the hospital was not operating in accordance with the by-laws and, as such, patient care was on the decline and that services were marginal at best.

Many Board and staff members, while acknowledging the existence of problems at the hospital, were, in essence, critical of plaintiff because the controversy did not remain "in house" as opposed to becoming a public matter and ultimately a political issue.

Defendants' major concern in seeking to keep the controversy "in house" was the

---

1. 47 percent of the patients did not see a doctor.
2. 34.4 percent of the patients were not administered to by a registered nurse.
3. 97.3 percent of the patients were not processed by a representative of the administration.
4. 15 percent of the patients were not seen either by a doctor or registered nurse.
5. 1.4 percent of the patients were processed by a representative of the administration, administered to by a registered nurse and seen by a doctor.

8. For example, plaintiff placed an advertisement in the local newspaper on June 15, 1978, stating:

In an ad which appeared in this paper recently, it was said I quit the medical staff at the Cleburne County Hospital of my own free

will. That ad, as presented, was a lie—the seven physicians and two dentists who signed it certainly know that I left the staff after it was recommended by the other doctors and dentists that I be suspended. That recommendation came as a result of my insisting on good care for patients. The hospital administrator and board never did what they are required to do by law—if they had, the problem would have been quickly resolved and I could have returned to the hospital. Not to this day have they done what they were required to do within ten days. These actions by the other doctors, hospital administrator and board resulted in a lawsuit which is pending. I was denied my rights and this is the only means to get them. I look forward to my day in court, for then I will have the opportunity to prove what I said.

fear that the interest of the hospital would be jeopardized. However, in concluding that plaintiff's staff privileges should not be reinstated, defendants made no effort to determine empirically and objectively, what harm, if any, had accrued to the hospital during the controversy or how plaintiff's reinstatement would cause patient care to diminish. In this regard, the Court notes that the fact that plaintiff became a candidate for county judge in 1978 and was rejected by the people of Cleburne County would indicate that plaintiff's influence in Cleburne County was not as weighty as defendants perceived.

In examining the criticism registered by plaintiff, the findings and recommendations of both the Arkansas State Health Department and the United States Department of Health, Education and Welfare articulating problems and deficiencies at the hospital, the Court is persuaded that it cannot be said categorically that plaintiff's criticism was either false or knowingly or recklessly made. In other words, the complaints were substantially accurate. More importantly, the question whether a county owned and operated hospital is affording maximum patient care to its taxpayers is and should be an issue of public interest and concern.

The Arkansas Supreme Court in the case of *Baxter County Newspaper, Inc. v. Medical Staff of Baxter General Hospital,* 273 Ark. 511, 622 S.W.2d 495 (1981), has made it plain that where a hospital is a county owned facility supported by public funds, the proceedings of the Board and its various committees are subject to Arkansas' Freedom of Information Act and the public possesses an unqualified right to know about the performance and accomplishments of the facility unless the proceedings fall under an exception to the Act. It is plain that had plaintiff elected to remain "in house" with his criticism, the public could not have been legally deprived of his expressed concerns about patient care at the hospital.

More importantly, it must be remembered that the exercise of the First Amendment right of freedom of speech cannot be conditioned, indeed within the context of the factual circumstances of this case, on whether the utterances are good for the community or will likely result in an adverse image to the facility and its personnal. The thrust of defendants' argument appears to be that plaintiff was obligated to some degree of personal loyalty to the hospital and medical staff which renders obselete the public's right to know; that this loyalty is vital to the proper functioning of the medical facility and a failure to adhere to this code of conduct justifies the revocation of plaintiff's staff privileges. The Court hastens to add that the Court is not convinced that this case involves the type of relationship between plaintiff and defendants that is of such a personal and intimate nature that certain forms of public criticism would likely undermine the effectiveness of the working relationship between them. Where, as here, comments on matters of public concern that are substantially true, such a concept is overshadowed by the force and effect of the First Amendment. *See: Pickering v. Board of Education of Township High School District 205, Will County, Illinois,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811. Moreover, defendants had the privilege, and as a matter of fact did so, to rebut plaintiff's criticism by stating the facts, as they perceived them publicly. This case does not present an issue in which plaintiff's criticism is so reckless and without foundation so as to question his fitness to serve on the medical staff at the hospital.

The Court holds that on February 22, 1977, when the medical staff voted to recommend to the Board to suspend the staff privileges of plaintiff pending peer review of his conduct, plaintiff's staff privileges were constructively revoked in retaliation for engaging in First Amendment protected activity. Plaintiff's withdrawal from activities at the hospital was involuntary. Moreover, the recommendation of the Joint Executive Committee to the Board not to reinstate plaintiff's privileges following the October 14, 1981, hearing and the Board's approval of the recommendation simply re-

affirmed defendants' resistence to plaintiff's exercise of his First Amendment rights. The Court is convinced that plaintiff's conduct in essence incurred the displeasure of the defendants and had a further tendency to cause indignation.

By way of summary, in the factual context of this case, plaintiff's exercise of his right to comment on matters of public importance may not serve as a reason for the revocation or the denial of medical staff privileges at defendants' hospital. Plaintiff has met the burden of establishing that his conduct was constitutionally protected and that his conduct was the motivating factor in defendants' action in denying him medical staff privileges. Defendants, acting under color of state law—a county facility and county officials working in close connection with private defendants whose status as officials of the Hospital, Medical Staff membership, and positions on various committees of the Hospital, is authorized by state law—have not demonstrated that they would have denied plaintiff medical staff privileges in the absence of the protected conduct.

The parties are afforded thirty (30) days from the date of this opinion to agree on the relief to be afforded plaintiff. If the parties are unable to agree, a hearing on the question of relief is hereby scheduled on March 29, 1985, at 9:00 a.m. o'clock, at Little Rock, Arkansas.

APPENDIX I

ARKANSAS

DEPARTMENT OF HEALTH

4815 WEST MARKHAM STREET

LITTLE ROCK, ARKANSAS 72201

REX C. RAMSAY, JR., M.D.,
DIRECTOR

February 1, 1977

Mr. Sam Rector

Administrator

Cleburne County Hospital

P.O. Box 510

Heber Springs, Arkansas 72543

Dear Mr. Rector:

Reference is made to an inspection of Cleburne County Hospital on January 31, 1977 by representatives of this Division.

*The following are item recommendations for your facility:*

I. Dietetic Services:

1. The procedural manual of the dietary department should be expanded, reviewed, revised, and to include the following:

 a. The preparation of food for modified diets.

 b. The menu planning should be adapted to present six weeks' cycle menus.

 c. Review and revise the pot washing procedures.

 d. Review and revise the orientation of the dietary employee.

 e. A policy and procedure should be developed and written pertaining to "left over food". All left over food should be dated and labeled.

 f. A policy and procedure should be developed on the rotation of milk. It is suggested that the milk company should be called in regard to the expiration date of milk as it was hardly visible.

2. The meetings held within the dietary department should be held on a monthly basis, documented as to subject discussed and a signed list of employees who attended these meetings. There was documentation of meetings in 1976 for only January, August, and December.

3. The menus written for the calorie level diets should reflect the preparation as on the day of the visit the vegetables were prepared with fat. The fruit exchanges of calorie controlled diets should be written out consistently in measured amounts.

4. The past four weeks' menus on file were not signed as approved by the Dietetic Consultant.

5. The wooden surface of cook's table should be covered with a material which is smooth, non-porous, and easily cleanable.

6. Concentrated inservice should be held on the preparation and serving of modified diets as there were a few errors noted.

II. Medical Staff:

1. Short stay medical records, on patients hospitalized 48 hours or less should be completed as soon as possible following discharge of the patient.

2. Disposition from the Emergency Room must be documented on every Emergency Room medical record.

III. Medical Records:

1. Only ink should be used to document in the medical record.

IV. Pharmacy:

1. Approved floor stock lists for the nurses' station, back-up stock, and specialty units should be updated to include approximate quantities to be kept. The lists should be approved by the Pharmacy and Therapeutics Committee, posted at the appropriate unit, and kept in the pharmacy manual. Reducing and limiting floor stock will enable better accountability, economics, and control of dated drugs.

2. Serially numbered forms with a perforated or carbon copy top are recommended for better control of scheduled drug disposition sheets. They are checked by the pharmacist and matched with the "stub" when the nurses complete each sheet.

3. Labeling on controlled substance counters is required to include the lot number and expiration date (where applicable).

4. Suggested additions to pharmacy policies and procedures were left with the pharmacist. A detailed policy on drugs for Emergency Room patients should also be included in the ER manual.

5. Each emergency kit or cart should have a list of drugs (with quantities) posted on the outside.

6. According to the Controlled Substances Act, completed Schedule II disposition records must be filed separately from other controlled substance records.

7. A system should be developed for a nurse to sign-out drugs she has administered from the back-up stock (oral drugs in the drawers). Although this is recorded on the chart, the pharmacy has no record of it.

8. All controlled substances (kept as floor stock) must be recorded on disposition sheets and included in the shift change count. Some units had Nalline, Valium, and Leritine which were not recorded or counted. The nurses' station had quite a few pints of Schedule V liquids which were not being handled as controlled substances; ex. Donnagel PG, Ambenyl, Novahistine expectorant, Novahistine DH, Parepectolin, Dimetane DC, and Phenergan VC with codeine. A procedure should be developed for recording use and wastage (with a witness' signature on wastage) of Pentothal in Surgery; the recorded "balance on hand" should be compared with the stock daily and verified as correct by the signatures of two nurses.

9. Because hospital prescription pads have become frequent targets of forgers, try to limit them throughout the hospital, and make them accessible only to physicians and licensed nurses. Pads were observed out on the nurses' station counter when no one was present at the station.

V. General Administration & Physical Plant:

1. The Heber Springs Volunteer Fire Department should be contacted and arrangements made for the department to conduct an annual physical inspection of the facility in order to familiarize all members of the department of the potential hazards within the facility and allow for adequate preparation in possible emergency situations.

2. All committee meeting minutes should show the name and title of those appointed to or attending the committee meetings.

3. All organizational charts, job descriptions, fire and disaster plans, operational procedural guidelines and written policy should be dated upon adoption, submitted to a subsequent annual review and any revision noted upon the copy of protocol.

4. The Maintenance Department should be furnished with a library of all current and pertinent NFPA manuals necessary for the operation of the facility. NFPA 101, NFPA 76BM, and NFPA 56A should be secured as soon as possible and all others necessary on a procurement basis.

5. Conductivity testings, while being accomplished in the critical areas of O.B. Delivery and the surgery suite have not been computated in the manner proscribed in NFPA 56A. Therefore, future test readings should be obtained and documented in the manner set out in NFPA 56A and on copies of the example of the form provided.

6. The facility should formulate and initiate a tagging system providing for the removal of deficient, faulty or malfunctioning equipment from the service cycle.

7. All electrical medical equipment available for use in the patient care areas should be placed on a bi-annual leakage test in accordance with NFPA–76BM and the results of the tests maintained.

8. The facility's Safety Committee should formulate and initiate a written, formal, restricted smoking policy, setting out areas of no smoking, restricted smoking and approved smoking. This guideline should also state upon whom the onus of responsibility is placed for the enforcement of this policy.

9. The facility's sprinkler system should be inspected and tested on a quarterly basis and a log maintained of the test.

10. The main oxygen supply cut-off valve located at the main oxygen supply storage area should be identified as such by tagging or distinctive painting in order to provide immediate identification in possible emergency situations and to avert possible erroneous cut-offs.

11. It is recommended that the Maintenance Engineer be allowed to apprentice for instructional purposes with a skilled Hospital Engineer in order to establish and effect a preventive maintenance program, preparation of procedural guidelines and a system of maintenance documentation for the facility.

VI. Nursing Services:

1. The wastage of controlled drugs is not being recorded properly. Nursing personnel should be instructed to record the amount of the drug wasted and the amount given, to indicate the patient the wastage is in reference to and two signatures (the person wasting the drug and the person witnessing the wastage).

2. When sterile supplies are sent back to central supply to be reautoclaved the item should be properly wrapped, new tape applied and marked with the date of expiration.

3. Humidifier bottles for oxygen should be dated when hung. After 48 hours the humidifier bottle should be dis-

posed of and replaced with a new bottle.

4. Gas autoclaved, plastic wrapped, and heat sealed items should be resterilized every 90 days.

5. Night-time nourishments for therapeutic diets should be charted in the nurses notes or on the activity sheet. The charting should include whether or not the patient received the nourishment and the amount of food the patient actually ate.

6. Needles and syringes should be properly disposed of by clipping the needles at the hub and clipping the tip of the syringe. This practice insures infection control for your employees and discourages non-medical usage.

7. Fruit juices should not be stored in open metal cans in the nourishment refrigerator. These juices should be placed in plastic or glass containers and properly labeled.

8. Nursing personnel should check the nourishment refrigerator for outdated milk. Several containers of outdated milk were noted in this area.

VII. Laboratory:

1. A written policy is needed that forbids smoking in the laboratory. Smoking is hazardous in that it tends to promote transmission of infectious bacteria and creates a fire hazard.

2. Monthly voltage checks should be made in the laboratory. This provides early warning to electrical problems.

3. Blood should be centrifuged with the stopper or some cover on the tube. Erroneous test results can be minimized particularly with electrolyte testing.

4. Strong acids and bases should not be pipetted by mouth. A procedure should be developed and personnel should be oriented to the hazards of acid reagents.

5. A written procedure should be developed for resolving Quality Control problems. This can save time and effort of personnel.

6. A written procedure should be developed for determining the calibration of the microhematocrit centrifuge (i.e. maximum packing time).

7. New reagents in serology should be verified for sensitivity against old reagents. This provides continuity in reporting.