**Dr. Wayne SMITH, Appellant,**

v.

**CLEBURNE COUNTY HOSPITAL,**
**et al., Appellees.**

Nos. 87–2587, 87–2620, 87–2621
and 87–2622.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1988.

Decided March 8, 1989.

Rehearing and Rehearing En Banc
Denied April 12, 1989.

John T. Lavey, Little Rock, Ark., for appellant.

David L. Williams, Gail Ponder, Walter Paulson, Little Rock, Ark., for appellees.

Before McMILLIAN, BOWMAN, Circuit Judges, and BOGUE,* Senior District Judge.

BOGUE, Senior District Judge.

Plaintiff Dr. Wayne Smith brought this action under 42 U.S.C. § 1983 alleging that defendants Cleburne County Hospital, members of the Hospital medical staff, and members of the Hospital Board of Governors, terminated his medical staff privileges because he engaged in First Amendment protected speech. After prevailing on the liability phase of a bifurcated court trial, *Smith v. Cleburne County Hospital,* 607 F.Supp. 919 (E.D. Ark.1985), Smith now appeals from the district court's failure to award him compensatory damages for lost income, for the loss of business interest, and for failing to mandate that defendants pay for his retraining costs. 667 F.Supp. 644. All defendants cross-appealed the district court's liability finding. It is upon the liability finding that we reverse.

## BACKGROUND

A general overview of the relevant facts will be given in this section with further specific facts presented in the discussion section of this opinion as required. The Cleburne County Hospital is owned and operated by Cleburne County, Arkansas. The business affairs of the Hospital are under the supervision of an eight member Board of Governors who are appointed by the County Judge. The County Judge is a non-voting ex officio member of the Board.

* THE HONORABLE ANDREW W. BOGUE, United States Senior District Judge for the District of South Dakota, sitting by designation.

In 1968, Dr. Smith submitted a written application to the Hospital for medical staff privileges. Pursuant to Hospital and medical staff by-laws, a doctor's application for medical staff privileges is reviewed by the medical staff, and if the medical staff finds that the applicant has met its established criteria for qualifications, then the medical staff recommends to the Board of Governors that the doctor should be extended privileges. According to this procedure, Smith was given privileges as a member of the active medical staff which allows for the unlimited admissions of his patients. However, active medical staff privileges were contingent upon the assumption of performing rotating emergency room coverage, attending regular medical staff meetings, and submitting a written application annually for renewed staff privileges.

Smith began to criticize the quality of patient care at the Hospital, citing perceived problems in nursing, dietary services and the nursery. By July 2, 1976 Smith's criticism of the Hospital's shortcomings prompted his notification of the Hospital Administration that he had no alternative but to resign from the staff. As of that date Smith ceased scheduling surgery at the Hospital and began referring patients to other hospitals.

Smith was unhappy with the Hospital Administration's response to his criticisms and found it necessary to address a letter to his patients on November 22, 1976 indicating that due to the lack of his expected level of patient care he was quitting using the Hospital in the near future. On the same day, Smith also addressed a different letter to the Board of Governors criticizing them as political flunkies and stated he was concerned that the negligent care at the Hospital would cause a person to die which only then would make them realize that problems exist. Furthermore, he called for a full investigation of his complaints and indicated that if the investigation showed that he was the problem, and not the reasons for his criticisms, then he should not be allowed to remain on the medical staff. This letter was made available to his patients.

Smith met with the Board of Governors to discuss the Hospital's problems in December of 1976. As a result of this meeting, the Board requested the Arkansas Department of Health (ADH) on December 20th to conduct an inspection and survey of the Hospital facilities and the quality of patient care. Again, Smith was unhappy with this response given to his criticisms and on December 29th, he wrote personal letters to various Board members calling for their resignations because in his view they were arrogant, indifferent, failed to learn their duties and perform them, and that they held contempt toward concerned citizens. Additionally, Smith wrote to the ex officio member of the Board, the County Judge, specifically attacking the competency of the Hospital Administrator and indicating that he felt the competency of the Hospital Administrator and indicating that he felt the biggest problem involving the Hospital was the desire on the part of some doctors to be thought of as gods.

At a regular medical staff meeting on January 3, 1977 Smith gave further response to the Board's proposal to have the ADH conduct an investigation by indicating that the only opinion capable of determining whether or not patients were getting adequate care was his. Thus, if an investigation was made and the Hospital was found to have adequate nursing care, then he would still be unable to live with his conscience and would resign.

On February 1, 1977 the ADH submitted the results of their investigation of Cleburne County Hospital. There were a total of fifteen deficiencies found by the Department's survey team which were in noncompliance with Arkansas' regulations for hospitals. Items which were found deficient included the preparation of food too far in advance of the meal to be served; incorrect water temperatures for pot washing; outdated cartons of milk; phone orders by physicians were not co-signed within 24 hours; outdated drugs were found; some controlled substances were not in locked storage; incomplete pharmacy records; pharmacy stop-orders were not being followed; irregular pharmacy staff meetings were held; improper wiring on some medi-

cal equipment was found; corridors were sometimes obstructed with infant cribs, stretchers and crash carts; L.P.N.'s were used as circulating nurses during deliveries rather than R.N.'s; and refrigerators storing blood needed to be monitored. However, it should be noted the ADH considered the amount of deficiencies were not unusual for a hospital of comparative size and found the Hospital and its staff were dedicated to patient care and safety.

Having found the investigation conducted by the ADH unsatisfactory, Smith announced his candidacy for County Judge, since the County Judge appoints the members of the Hospital's Board of Governors, on February 9, 1977. The election was to be held in November of 1978. Smith considered that he needed such an early announcement prior to the election because he felt that the Hospital may not be open at the time of the election due to existing financial mismanagement, and he also felt it was time to take the issues concerning the Hospital to a political platform. In his announcement,[1] Smith criticized the Board of Governors, the County Judge, the medical staff, the Hospital Administration, and the nursing staff implicating that they collectively contributed to a "rotten political mess" involving petty, corrupt politics with motives similar to crooks, thieves, cheats and robbers. Smith further called for the resignation of the Board.

After concluding that the investigation conducted by the ADH did not support Smith's claim of improper patient care, the medical staff unanimously recommended to the Board of Governors on February 22, 1977 that the Board temporarily suspend Smith's staff privileges pending further investigation by the Arkansas Medical Society. The medical staff specifically disagreed with Smith that the staff physicians operated deceptively and wholly for self-interest. They also disagreed that the overall patient care was poor or that the medical staff was substandard. Furthermore, because of Smith's request that a full investigation be made and the fact that the

---

1. The following is a prepared statement released to the press:

Things are in a turmoil, our hospital is going broke and nothing is being done. I'm running for county judge and will be asking these and other questions.

1. Why does the County Judge refuse to say publicly what he says privately?

2. Why has the Board refused to investigate very specific allegations?

3. Why does the Board not supervise the hospital as it should?

4. Why does the Board allow the County Judge to run business that is supposed to be the province of the Board?

5. Why does the Board refuse to supervise the medical staff as it should?

6. Why does the Board not wish the residents of the county to know what goes on?

7. Why does the Board tell residents of the county that the hospital problems are none of their business?

8. Why did the Board hire a man for administrator who is totally without qualifications for the job?

9. Why do these men insist on remaining on the Board when they obviously aren't doing their job?

10. Why does the administrator insist on staying with the job when he obviously isn't doing the job?

11. Why has the Board become synonymous with Cleburne County Politics, leaving out the [Greer's Ferry] area?

12. Why does the medical staff not act like a medical staff?

13. Why does the medical staff accept pay from the hospital from E.R. coverage, yet not want to cover it?

14. Why can't the nurses be indoctrinated and properly trained?

15. Why do my critics not speak up officially and do something about me, if I'm so wrong?

16. Why do citizens of the county not speak up?

17. Why do I call this a rotten political mess?

Because it is the kindest thing I can say about the judge, Board, administrator and other doctors. If I don't attribute this to petty, corrupt politics, then what motive may I use? Are they crooks, thieves, cheats, robbers, or what?

I think some changes need to be made, and resignation of the Board members (excluding the new member, Mr. Steward) and administrator would be in order now. They haven't been big enough to do what they should before, so I don't really expect it now. I will be busy in coming weeks telling of their failures and intolerable attitudes.

The hospital is my basic reason for attacking, but my adversary is a rotten political machine. Many in the county have expressed similar views, and I will be actively seeking their support. Every expression of support will be considered a vote for good hospital care of our sick.

ADH's investigation did not support Smith's criticisms, the medical staff determined to make their recommendation to the Board in response to Smith's claim on November 22, 1976 that if an investigation demonstrates that he was the problem, and not the reasons for his criticisms, then he should not be allowed to remain on the staff.

In response to the medical staff's recommendation, Smith wrote a letter on February 25, 1977 to the Hospital Administrator stating:

In view of the allegations made by the medical staff, I feel I have no choice but to cease hospital activity until these matters are settled. I have patients in the hospital at this time and will discharge them when they are ready to go and plan no further admissions with the possible exception of an OB patient or possibly two.

Smith admitted no patients to the Hospital after this date, and further refused to comply with rotating emergency room coverage assignments.

The Hospital Administrator responded to Smith's letter on March 14, 1977 by indicating that he understood Smith's letter as a letter of resignation and would forward it as such to the Board of Governors. Smith responded by letter on the same day that he had not resigned from the active medical staff. On March 17th, the Hospital Administrator responded to Smith by letter on behalf of the Board:

As the Board of Governors considers you to be an active member of the medical staff of Cleburne County Hospital, I have been instructed to remind you of the responsibilities a physician must accept to retain this privilege. Of course, this includes emergency room coverage.

This letter was submitted to Smith after a Board of Governors' meeting was held on March 16th where the Board additionally voted to appoint a Joint Committee comprised of some members of the Board and the medical staff to consider further the medical staff's recommendation concerning Smith. Accordingly, Smith responded to the Hospital Administrator on March 18,

1977 that upon advice of his attorneys he would not be actively participating in Hospital activities.

On March 24, 1977 the Joint Committee decided to formally request the Professional Relations Committee of the Arkansas Medical Society to investigate and, if possible, mediate the controversy between Smith on the one hand, and the Board and medical staff on the other. After investigation during the following months, the Arkansas Medical Society viewed the controversy as a personality conflict and elected not to participate in further investigation or mediation.

An executive committee meeting of the medical staff officers met for normal business on July 5, 1977. In addition to other business items, the executive committee noted that Smith had missed more than four medical staff meetings and as a result, according to by-laws, placed himself off the active medical staff and on the courtesy medical staff. As a courtesy medical staff member, Smith could not admit more than six patients per year and held no other staff privileges. No response from Smith was made to this change in medical staff status.

Because the Hospital's fiscal year ended at the end of September of every year, each medical staff member was required to submit a yearly application for renewed medical staff privileges prior to the last Board meeting of the current fiscal year. Correspondence from the Hospital addressed to Smith indicated that he needed to complete the required forms regarding reappointment and return them by August 20, 1977. No forms, letters, or notice was made by Smith to the Hospital of his intent to obtain reappointment to the medical staff.

No further action was taken by the Hospital or the Board of Governors until the Hospital's Joint Executive Committee on October 14, 1981 was ordered by the district court to conduct a hearing on whether Smith should be granted renewed medical staff privileges. This hearing was held to allow Smith to exhaust his administrative remedies before a trial on the merits could

be heard. The Joint Committee concluded that Smith's continued criticisms were detrimental to the public purpose the Hospital performs. Additionally, they also found that the personality conflicts between Smith and the medical and nursing staffs would disrupt the efficiency of the Hospital if Smith's staff privileges were restored. Accordingly, the Joint Committee unanimously recommended to the Board that Smith be denied renewed medical staff privileges.

## DISCUSSION

The district court found that Dr. Smith's medical staff privileges were constructively revoked in retaliation for his engaging in First Amendment protected speech on matters of a public concern. *Smith v. Cleburne County Hospital*, 607 F.Supp. 919, 927 (E.D.Ark.1985). We are unable to agree because Smith was not constructively denied medical staff privileges, but rather voluntarily chose to withdraw from participating in required Hospital activities necessary to maintain his status on the active medical staff. Furthermore, while certain aspects of Smith's speech were constitutionally protected activity, not all of his activity was such, and thus the protected activity engaged in was not a substantial or motivating factor in the action taken against him.

### A. *Constructive Discharge*

On February 22, 1977 the medical staff, in accordance with Hospital by-laws, unanimously voted to recommend to the Board of Governors that Smith's staff privileges be temporarily suspended pending further investigation by the Arkansas Medical Society. The medical staff was prompted at this time to make such a recommendation for two reasons. First, the full investigation called by Smith was conducted by the Arkansas Department of Health (ADH). The results of their investigation indicated that indeed there were problems but they did not rise to the level of problems Smith was suggesting. Second, Smith indicated to the Board on November 22, 1976 that once a full investigation was made and if he was found to be the problem then he should not be allowed to remain on the staff. The medical staff on February 22, 1977 believed that the ADH report vindicated the Hospital against Smith's claims. As such, they felt Smith should be temporarily suspended pending a peer review of his conduct by the ethics committee of the state medical society.

The facts as outlined in this opinion lead us to the conclusion that once Smith received a reaffirmation from the Hospital Administrator that he was still a member of the active medical staff, he was obligated to fulfill the conditions of his staff privileges. Smith refused to comply with these requirements. Additionally, as the facts indicated, Smith also failed to submit the required forms at the end of the Hospital's fiscal year for reappointment to the medical staff.

Although Smith and the other medical staff doctors were not employees of the Hospital receiving a salary, their conduct and their practice of medicine was within the parameters of the Hospital's legitimate interest in promoting the efficiency of the public service it performs. A state operated hospital has the right, and the duty, to regulate the conduct of its medical staff and in maintaining the quality of medical care delivered to its patients. *Daly v. Sprague*, 742 F.2d 896 (5th Cir.1984). The Hospital afforded every opportunity to Smith to comply with the necessary requirements to maintain his staff privileges. By his inaction in assuming these duties, Smith voluntarily withdrew from the Hospital.

A constructive discharge would occur only if the Hospital rendered Smith's working conditions intolerable in order to force him to quit. *Southside Public Schools v. Hill*, 827 F.2d 270, 274 (8th Cir.1987). There is nothing in the record which would suggest that the Hospital tried to create intolerable working conditions in order to force Smith to quit. In fact, it is abundantly clear that the Hospital and its staff tried to accommodate Smith as much as possible as demonstrated in their continued efforts to enable Smith

to maintain his privileges. Additionally, it is noteworthy that the Joint Executive Committee did not take official action against Smith until the court ordered a hearing in 1981. Under the facts of this case, we believe the Board of Governor's and the Hospital's restraint is admirable.

■■■ We hold that a state hospital has the right to regulate the requirements of physicians to obtain and continue to maintain medical staff privileges as a legitimate interest in promoting the efficiency of the public service it performs. As such, the Hospital had the right and the duty to extend medical staff privileges to any doctor fulfilling the necessary requirements for holding staff privileges according to the Hospital by-laws. Once a doctor refuses to comply with these necessary requirements, then the doctor voluntarily withdraws from his association with the Hospital. The fact that the Hospital reaffirmed Smith's medical staff privileges in order to dispel any perception that Smith no longer held privileges, clearly refutes Smith's claims that he suffered a constructive revocation of privileges.

## B. *First Amendment Analysis*

Dr. Smith, as a member of the active medical staff of Cleburne County Hospital, was an independent contractor rather than a salaried employee of the Hospital. However, the Hospital, as a public institution, has the right to regulate its medical staff in order to insure the delivery of adequate medical care to its patients. *Daly v. Sprague*, 742 F.2d 896 (5th Cir.1984). According to the Hospital's by-laws, not only were there established guidelines in determining the competency of new applications to the medical staff, but also there were guidelines for existing staff members to follow in order to maintain their privileges. While there is not a direct salaried employment relationship, there is an association between the independent contractor doctor and the Hospital that have similarities to that of an employer-employee relationship. For instance, there is an application process for privileges, there are required duties to be performed by both parties, and

there are potential liabilities each party is responsible for jointly and severally for tortious conduct. As a result of these similarities, the application of the *Pickering* balance test and its progeny in this case is appropriate and will be discussed below.

Smith initiated this action on April 26, 1977 alleging that the defendants terminated his medical staff privileges because he engaged in First Amendment protected speech. The inquiry into whether speech is constitutionally protected is a question of law. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Patteson v. Johnson*, 721 F.2d 228 (8th Cir.1983). A court must first consider whether the speech addresses a matter of public concern in order to be constitutionally protected. This determination is made by a review of the content, form, and context of the speech. *Connick*, 461 U.S. at 148–49, 103 S.Ct. at 1690–91; *Accord Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

It is clear that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689, (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982)). However, when there is a conflict between speech upon matters of a public concern and the legitimate interest of a public institution in promoting the efficiency of the public service it performs, a balance between this conflict is required. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 285, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

Smith's suit challenged that he was wrongfully terminated from the Hospital's medical staff because he engaged in First Amendment speech. Courts reviewing challenges to discharges based on constitutionally protected speech apply a three-step analysis. *Hamer v. Brown*, 831 F.2d 1398, 1401 (8th Cir.1987) (citing *Bowman v. Pulaski County Special School Dist.*, 723 F.2d 640, 643 (8th Cir.1983)). The Court

must determine whether (1) the plaintiff has carried the burden that he or she engaged in constitutionally protected activity, *Pickering,* 391 U.S. at 569–72, 88 S.Ct. at 1735–37; (2) by engaging in such activity the plaintiff can show that it was a substantial or motivating factor in the action taken against him or her, *Mt. Healthy,* 429 U.S. at 285–87, 97 S.Ct. at 575–76; and (3) can the defendant refute plaintiff's claim by demonstrating that the same action would have been taken in the absence of the protected activity, *Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 416–17, 99 S.Ct. 693, 697–98, 58 L.Ed. 2d 619 (1979); *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

 Under the first step of analysis, where Smith must show that he engaged in protected speech, the district court was persuaded that Smith's criticisms were shown to be substantially accurate, as demonstrated by the report submitted by the Arkansas Department of Health. Due to the nature of the complaints, the district court was correct in determining that some aspects of Smith's complaints were a matter of public concern, at least as they were initially made. However, it is clear in the record that Smith's criticisms, when viewed in their cumulative effect, evolved into statements of personal animosity against specific people and further evolved into a pattern of disrupting the public service the Hospital performs. Smith went beyond the scope of protected speech when his criticisms became caustic personal attacks on almost every person connected with the Hospital ranging from the County Judge (as ex officio Board member) to staff personnel. These attacks were vindictive and personal, and as such, are not a matter of public concern.

For instance, Smith began writing letters to his patients and to the Board of Governors in late 1976 claiming that the Hospital could not provide patients with a level of care he feels they should receive. From Smith's view, this was because the Board of Governors were political flunkies who were arrogant, indifferent, failed to learn their duties, and held contempt toward concerned citizens. The purpose of these letters was not to constructively criticize the Hospital, which is a constitutionally protected activity of a matter of public concern. Instead, the letters were disparaging personal attacks against various people written for the ultimate purpose of economically disrupting the Hospital.

 Under the second part of the three-step analysis, Smith must show that the Hospital revoked his medical staff privileges for the substantial or motivating reason that he engaged in protected speech. The district court was persuaded that Smith's revocation of privileges was the direct retaliatory result that the controversy between Smith and the Hospital did not remain "in-house" and became a public issue. As a result of the controversy becoming public, the district court believed that Smith's public speech on the controversy was the motivating factor in the revocation of his privileges.

Smith's initial criticisms of the Hospital indeed became a matter of public concern and was given press coverage from the local newspapers. However, when the medical staff unanimously voted to recommend that Smith's privileges be temporarily suspended pending a peer review, the Hospital's prepared statement indicated that it was Smith's disruptive attacks on various individuals over a period of three to four years, even though some of these attacks were publically made, which were one of the considerations in the medical staff's recommendation. The prepared statement even went on to further state the medical staff's other reason for recommending temporary suspension. For instance, it pointed to the financial impact on the Hospital the controversy created; the low morale as a result of Smith's direct attacks on various nurses; the continued disagreement with Smith that the medical staff does not operate deceivingly and wholly for self-interest; the continued disagreement with Smith that the medical staff itself is substandard; and that the Department of Health's investigation did not support the nature of his criticisms.

The fact that Smith's initial criticisms became a public issue alone is insufficient in Smith's burden to show a causal connection that his public speeches were a substantial or motivating factor for the Hospital's alleged revocation of his privileges. Merely because the criticisms became a public issue was not the reason the medical staff voted to recommend that Smith's privileges be temporarily suspended. Instead, it was because the medical staff viewed Smith's behavior over a period of three to four years as disruptive and argumentative.

The third step of analysis in reviewing challenges to discharges based on constitutionally protected speech is whether the defendants can refute Smith's claim by demonstrating that the same action would have been taken in the absence of the protected activity. Within this analysis, the *Pickering* balance test requires the balancing between the interests of the person engaged in protected speech on matters of public concern and the interests of the public institution in promoting the efficiency of the public service it performs. *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734; *see also Lewis v. Harrison School Dist.* 805 F.2d 310, 313 (8th Cir.1986) *cert. denied* 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987). In applying the *Pickering* balance test, factors to be weighed include (1) the need for harmony in the office or workplace (or hospital); (2) whether the public institution's responsibilities require a close working relationship between the plaintiff and co-workers when the speech engaged in has caused or could cause the relationship to deteriorate; (3) the time, manner and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the person engaging in speech is impeded in their ability to perform his or her duties. *Hamer*, 831 F.2d at 1402 (citing *Bowman*, 723 F.2d at 644).

By the time the medical staff unanimously voted to recommend Smith's temporary suspension, there was a long history of conflict between Smith and various Hospital administrators, members of the Board,

nursing staff and other personnel. Smith notified the Hospital in July of 1976 that he was going to resign from the medical staff because of his disenchantment with the quality of patient care. Unhappy with the Hospital's response to his criticisms, Smith wrote a letter to his patients in November of 1976 saying he was quitting the Hospital in the near future. Because Smith had one of the largest patient loads in the Hospital, the economic effect of Smith quitting the Hospital would surely be felt.

But Smith was not making mere criticisms of the Hospital. He attacked several Board members by letter chastising them as political flunkies. The purpose of these personal attacks, in addition to Smith's letters to his patients, was a calculated effort to disrupt the efficiency of the Hospital. By bringing economic coercion against the Hospital as a public institution, even when some of Smith's initial criticisms were a matter of public concern, goes beyond the scope of constitutionally protected activity in view of the six factors enunciated in *Hamer* within the parameters of the *Pickering* balance test.

There is ample evidence to conclude that the medical staff found other numerous and sufficient reasons for voting to recommend that Smith's privileges be temporarily suspended. Smith was disruptive and a malcontent. He disassociated himself from the efficiency of the Hospital because he considered the only view which had merit was his. Even after a full investigation was made, he rejected the Department of Health's findings as insufficient and a cover-up.

We hold that when a person does initially engage in protected First Amendment speech on matters of a public concern, they may not use this protection, in the guise of public concern, to also level personal attacks on various officials and employees of a public institution which causes disruption, disharmony, dissension, and creates an adverse economic effect on the public service the institution performs. Because of the course of disruptive behavior of Smith over a period of three to four years, which included personal attacks on

various people, the medical staff had sufficient foundation to recommend to the Board that Smith's privileges be temporarily suspended pending peer review.

## CONCLUSION

The record in this case is voluminous and extensive. However, when the record is reviewed as a matter of law, the progeny of *Pickering* have refined the scope of what is considered protected speech as a matter of public concern and its effect on the public institution's ability to perform its public service. As a result of these refinements, to suggest to those persons engaged in protected speech to hide behind its protection to also engage in non-protected personal attacks, is clearly beyond the special protection in the hierarchy of First Amendment values on speech of public concerns. We simply cannot allow this to happen in this case.

Dr. Smith did voice initially legitimate concerns. He also voiced personal attacks and when read in the manner, place and context in which they were made are not on matters of public concern. Therefore, when the medical staff voted to make their recommendation to the Board of Governors, it was for substantial reasons other than to retaliate against Smith for engaging in protected speech.

Smith was not discharged nor had his privileges revoked, either in fact or constructively. It was Smith's failure to comply with the necessary requirements to maintain staff privileges which led to his voluntary withdrawal from the Cleburne County Hospital's medical staff. Moreover, even if the Hospital constructively revoked Smith's privileges, there are other substantial reasons for the medical staff's recommendation which were not based on Smith engaging in First Amendment protected speech.

For the reasons discussed in this opinion, the district court is reversed and the case is dismissed.